## B. R. E. HOLTON et al. v. LILLIAN M. COCHRAN, Appellant.

### Division One, December 24, 1907.

1. **WILL CONTEST: Testamentary Capacity: Closely Related Witnesses.**  Witnesses who bear close family, social or business relations with testator possess the most favorable opportunities for knowing his mental condition, and usually their testimony as to his mental capacity is entitled to great weight.

2. **————: Incapacity: Change in Character.**  Marked changes in the social and business habits of a testator of mature years, and in his love and devotion for his children, are of themselves strong evidence of his unsoundness of mind.

3. **————: ————: ————: Peremptory Instructions for Will.** Testator was born in 1843 and died by suicide December 2, 1902, leaving two married daughters and one grown son, and a second wife whom he married in 1899 and to whom he left by last will, dated November 10, 1902, all his property, amounting to over $100,000, except $5,000 to one daughter, $5 each to the other daughter and son, $500 to each of two brothers, $700 to a niece, and $500 to his wife in trust for an insane brother to be paid to him as his necessities might require.  He had on November 16, 1901, made another will, and in that he gave to the one daughter $10,000, but the other bequests were much the same as in the last one.  The first will was written from memoranda in the hand-writing of the second wife, by whom he had no children.  In the preparation of the last will, he went to the office of a business friend, stated he wished to write his will and asked the use of his stenographer, and, holding the former will in his hands, dictated to her its terms, she transcribed it on her typewriter, and he and the friend compared it with the first will, and it was witnessed by this and two other friends called in for the purpose, all of whom testified that he was at the time of sound mind.  The following day he transacted business at the bank in a rational way.  He had prior to 1891, when his first wife died, been for many years a successful business man, of a high sense of honor and justice, honest in all his dealings, devoted to her and his children, lived happily with

Holton v. Cochran.

them, with her was a regular attendant at church, sent his children to Sunday school, and was always interested in church work and charities. Her death caused him deep and permanent grief, and soon thereafter he began to drink much whiskey, and continued to do so till his death, the habit increasing with the years, and he grew exceedingly profane and even vulgar in the presence of women before the will was made. For a few years after her death he continued to treat his children with kindness, even more marked than during her life, but soon after her death her father died and left $5,000 to one of his daughters and a like amount to his son, and made him executor of his estate, and provided that in lieu of the money he could transfer to the two legatees $10,000 of the stock of his company which that testator at the time held as collateral for a loan to him, and that option he exercised, but continued to hold the stock as trustee for them, but when his company was consolidated with another, at the rate of five shares in the new for one in his, he set up the claim that they were each entitled to only $5,000 of the stock of the new company, instead of $25,000, and when they insisted on their rights, he asserted that they were trying to rob him and threatened to disinherit them, and before the will was made drove them from his presence, and his former love for them seemed to change to hate, spite and ill-will. He had for years been kind to his aged parents, supporting and maintaining them, but at his father's funeral said he did not want any damned singing during the services or praying at the grave, and after the funeral said to his brother that his mother was a damned fool and he wished she was dead and in hell. For years he had urged the consolidation of his company with others on the ground that he wished to retire from business, and when the consolidation was effected he felt greatly aggrieved and fell out with his old associates because he was not elected manager of the new company. Before the consolidation, he neglected his business, could not concentrate his mind on any business transaction, repeatedly stated he "was exhausted and tired," and in the discussion of any business proposition, if it did not conform to his views, he would fly into a fit of uncontrollable anger and profanity. He constantly complained that no one cared for him, that no one loved him, not even his wife, and became despondent, and often wept without apparent reason, piteously cried and was inconsolable. His second wife was a young widow, who had been stenographer for his company. He told his children before he married her that he did not love her, but wanted some one to take care of him. During the last year or two of his life she did most of his correspondence, signed his name to some of his letters, attended to most of his business, looked after his bank account and drew

his checks, and at her solicitation he transferred to her his life insurance theretofore made for his children, about $20,000 of stock and $4,500 in money. The excessive use of alcohol materially affected his mind, and brought on neurasthenia and *senile dementia*. These facts were established by his children, brothers, associates in business, physicians and others closely associated with him personally. On the other hand, a large number of witnesses—old soldiers, long-time acquaintances, business friends, lawyers, hotel-keepers, physicians, dentists—testified that he was of sound mind to the last; that, while he was always excitable, positive, restive under opposition, emotional and loud, he was always alert in business, retained his faculties to the last, did not lose flesh in the last years of his life and showed no signs of *senile dementia*. *Held*, that the court could not have declared as a matter of law that he was capable of making a will, and properly submitted the issue to the jury.

4. ———: **Incapacity: All Necessary Requisites: Mental Delusion: Instruction: Contradictory.** An instruction which told the jury that even though they might find the testator possessed many of the mental requisites necessary to qualify him to make a will, yet if they further find that he was laboring under an insane delusion that his son and daughter had exacted from him and he had turned over to them a greater amount of property than they were entitled to as special legatees of their grandfather, and that such delusion overcame and controlled his will and judgment in the execution of his will which disinherited them, they would find the instrument was not his will, is not inconsistent or contradictory. It does not tell the jury that if he possessed all the requisites necessary, but many, etc. The law is that the testator must possess all the mental requisites necessary to a valid will, namely, capacity to comprehend all his property and all persons who reasonably come within the range of his bounty, and sufficient intelligence to understand his ordinary business, and to know what disposition he is making of his property.

5. ———: ———: **Delusion: Evidence: Unlawful Exaction by Children.** Evidence that testator was the trustee of $10,000 of the capital stock of his company for his children left them by the will of their grandfather; that upon the consolidation of his company with a new company at the rate of one share of the stock of his company to five in the new, he still claimed the children were entitled to only $10,000 of the stock of the new company; that they exacted of him a settlement by which they received from him only four-fifths of the stock to which they were entitled and by which they surrendered to him nearly $8,000 in dividends to which they were legally entitled; that his refusal to give them more than $10,000 of stock in the new

company was based on a claim that through his efforts and connection with his company the value of their stock had been greatly enhanced and for that reason he was entitled to all the increase; that he was their father, was paid a fair salary for whatever services he rendered his company, was himself but one of a number of men who contributed their services to the company's prosperity and was by no means its controlling spirit, and that after his children exacted the settlement he frequently said they had robbed him, and his former love for them turned into hate and he drove them from him with a curse and disinherited them in his will, is substantial evidence that he was laboring under an insane delusion, especially as they were otherwise without means and he was wealthy, and is sufficient evidence upon which to base an instruction to the effect that if testator was laboring under an insane delusion that the children had exacted of him a greater amount of stock than they were entitled to and that such delusion overcame and controlled his will and judgment in the execution of his will, the jury were authorized to find that the instrument was not his will.

6. ———: ———: **Unaided by Others.** An instruction which tells the jury that they must believe from the evidence that testator had sufficient understanding to comprehend the nature of the transaction he was engaged in, the nature and extent of his property, and to whom he desired to give it, "without the aid of any other person," is not bad. It does not prescribe a qualification not set out in the Statute of Wills.

7. ———: ———: **Hypothetical Question.** It is the duty of appellant to point out on appeal in what particular the hypothetical question improperly grouped the facts and how they misled the jury.

8. ———: ———: **Suicide: Presumption.** The fact that testator committed suicide a short time after the execution of the will and that there was a strong predisposition to insanity in his family are facts to be taken into consideration along with other facts and circumstances in the case bearing upon his capacity. But suicide raises no presumption of his incapacity, and the refusal of an instruction for proponent declaring that the fact that he committed suicide shortly after the execution of the will creates no presumption that he was insane when he executed it, is not error.

9. ———: ———: **Condition in Former Years.** Evidence of the unusual action of testator at the time of the death of his wife and father-in-law in 1891 may be admitted as tending to establish the condition of his mind when he executed the will in 1902.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Blevins,* Judge.

AFFIRMED.

*Geo. D. Reynolds* and *George V. Reynolds* for appellant.

(1) The prima-facie case, made out by appellant, was never overthrown by any substantial evidence introduced or offered by the respondents. This court has established as the law of this State, by an unbroken and long line of decisions, that while "it will not weigh conflicting evidence to determine whether the jury found against the weight of the evidence . . . it will examine the record of the evidence in a will case, to see if there is any substantial evidence to support the verdict." Sayre v. Trustees Princeton University, 192 Mo. 95; Archambault v. Blanchard, 198 Mo. 384; Hill v. Boyd, 97 S. W. 920. An examination of the testimony introduced by respondents, even without considering that offered by appellant in rebuttal, but having in mind the testimony in chief of appellant, will show that there was no substantial evidence of mental incapacity introduced to overthrow the will; and an examination of all the testimony for appellant will conclusively demonstrate that there was no substantial evidence whatever of mental unsoundness, insane delusion, or undue influence, and the trial court should have given the instructions asked by appellant for a verdict in her favor, and it was error not to have done so. Riggin v. Westminster College, 160 Mo. 570; Crowson v. Crowson, 172 Mo. 691; Sayre v. Trustees of Princeton University, 192 Mo. 95; Brinkman v. Rueggesieck, 71 Mo. 553; Hughes v. Rader, 183 Mo. 703. (2) There is no evidence whatever in this case of any insane delusion such as the courts hold must be present to invalidate a will. The definitions by the

courts of this State and other States as to insane delusions are set out in the case of Knapp v. St. Louis Trust Company, 98 S. W. 78 and 79. Am. Bib. Soc. v. Price, 115 Ill. 623; Dunham's Appeal, 27 Conn. 192; In re Smith, 52 Wis. 573. The insane delusions or hallucinations must have reference to person or things —not to opinion or faith. Bonard's Will, 16 Abb. (N. S.) 128. A belief based on evidence, however slight, is not delusion. Stackhouse v. Horton, 15 N. J. Eq. 202; Clapp v. Fullerton, 34 N. Y. 190; Claflin's Will Case, 32 Wis. 557. An error in fact, or a prejudice or suspicion, is not an insane delusion. Boardman v. Woodman, 47 N. H. 120; Greenwood's Case, 13 Vesey, Jr. 89. Where the occasion for anger or distrust is real, and not a figment of the imagination, if the resentment or distrust is not founded wholly on delusion, a testator may, if he chooses, disinherit those who have natural claims upon his bounty. In such case there is no ground for setting aside the will, as it cannot be said to be the offspring of delusion. Hollinger v. Syms, 37 N. J. Eq. 230; Dale v. Dale, 36 N. J. Eq. 282; Duffield v. Morris' Executors, 2 Harrington (Del.) 375; In re Claflin's Will, 32 Wis. 565; Trumbull v. Gibbons, 22 N. J. L. 157; Wintermuth v. Wilson, 28 N. J. Eq. 438. (3) The fact that the testator disinherited two of his children and cut down a former bequest to a daughter one-half, is no evidence of insane delusion. The proof is clear of the estrangement of the father and children. Meier v. Buchter, 197 Mo. 86. (4) The fact that the will in contest was a mere copy with but few comparatively insignificant changes, of a previous one, executed the year before, shows ample time for deliberation on the part of the testator and that the will was not the result of passion, delusion or sudden emotion, but was the deliberate act of the testator. Harris v. Hayes, 53 Mo. 95; Ranken v. Ranken, 61 Mo. 295; Thompson v. Ish, 99

Mo. 171.    (5)  The admission of the evidence of the
actions of Edward K. Holton at the time of the death
of his wife and father-in-law, which events occurred
in 1891, had no tendency to establish the condition
of the testator's mind at the date of making his will
in 1902.    They were too remote to tend to establish
insanity in 1902.    Von de Veld v. Judy, 143 Mo. 348.

*Virgil Rule* for respondents.

(1)   Under the statute of wills a person must be
of "sound mind" before he can make a valid will.
R. S. 1899, sec. 4602.   (a)  In all will cases, contested
on the ground of unsound mind, the sole question is,
did the testator possess that reasoning power and un-
derstanding which springs from a "sound mind?" Ar-
chambault v. Blanchard, 198 Mo. 384; Crossan v. Cros-
san, 169 Mo. 639.   (b)  And in order that the testator
may comprehend and understand the nature and ex-
tent of his property, and in order that he may com-
prehend and understand who reasonably come with-
in the range of his bounty, and in order that he may
comprehend and understand to whom he desires to
and is giving his property, "no disorder of mind shall
poison his affections, pervert his sense of right, or
prevent the exercise of his natural faculties; no in-
sane delusion shall influence his will in disposing of
his property and bring about a disposal of it, which,
if his mind had been sound, would not have been made."
Banks v. Goodfellow, L. R. 5 Q. B. 565.    Therefore,
if Capt. Holton, from the time of turning over to his
son, Birch, and his daughter, Alice, the stocks of the
Ames Company, belonging to them, down to and in-
cluding the time of the execution of the paper offered
as his will, labored under an insane delusion that
said son and daughter had exacted of him and that
he had turned over to them a greater amount of said
stock than they were lawfully entitled to demand and

receive from him, as their trustee, and such delusion overcame and controlled his will and judgment in the execution of the paper offered as his will, he was lacking in a mental requisite necessary to the making of a valid will, within the definition above set forth. Am. Bible Soc. v. Price, 115 Ill. 632; Knapp v. St. L. Trust Co., 98 S. W. 78; Lancaster v. Lancaster, 87 S. W. 1137; Benoist v. Murrin, 58 Mo. 319; Dorman's Will, 5 Dem. 112; Swygart v. Willard, 76 N. E. 762; Stanton v. Wetherwax, 16 Barb. 262; Shaw's Will, 2 Redf. 108; Calhoun v. Jones, 2 Redf. 34; Merrill v. Rolston, 5 Redf. 221; Jenkins' Will, 80 N. Y. Supp. 664; Thomas v. Carter, 170 Pa. St. 272; Greenwood's Case, 3 Curtis Ecc. 1; Orchardson v. Cofield, 171 Ill. 35; Bordman v. Woodman, 47 N. H. 136; Duffield v. Morris' Exrs., 2 Harrington 379; Nicewander v. Nicewander, 151 Ill. 164; Layer v. Layer, 62 S. W. 18.    (2) (a) A delusion which leads a father to the belief that his children, or those who would naturally come within the range of his bounty, entertained towards him hostile feelings and sought to make his life unhappy, which induced him to regard them as unworthy of his affection and bounty, avoids a will or a gift made under such a delusion.    Riggs v. Am. Home Soc., 35 Hun 656, 42 Hun 658; Riggs v. Am. Tract Soc., 95 N. Y. 511; Am. Seaman's Soc., 33 N. Y. 619; Ballantine v. Proudfoot, 62 Wis. 216.    (b) Delusion is the true test of the presence or absence of insanity.    Daw v. Clark, 3 Addams, Ec. T. 79; Burkhead v. Gladish, 123 Ind. 338; Stanton v. Wetherwax, 16 Barb. 259; Re Forman, 54 Barb. 274; Wheeler v. Alderson, 3 Hagg. Ecc. 574; Boughton v. Knight, L. R. 3 Prob. Div. 64. (c)    If, therefore, Capt. Holton had any delusion which caused him to make a will which he would not have made but for the delusion, it was proper for the court to instruct as to such delusion.    The ultimate

208 Sup—21

fact of mental capacity is all that is proper in the pleading. Delusion and insanity, or unsound mind as it is termed under Statute of Wills, are regarded as almost, if not entirely, convertible terms. Am. Bible Soc. v. Price, 115 Ill. 655; Boughton v. Knight, L. R. 3 Prob. Div. 64; Smith v. Tebbitt, L. R. 1 Prob. Div. 401. (d) An insane delusion is a belief in things so improbable under the surrounding circumstances that no person of "sound mind" would give them credit. Benoist v. Murrin, 58 Mo. 307; Riggs v. Am. Home Soc., 35 Hun 656. (e) A belief in something which no sane person would believe in, however, is unequivocal evidence of insanity, though there might be a shadow of evidence that the fact existed. Riggs v. Am. Home Soc., 35 Hun 656. (f) It is not claimed that mere prejudice or suspicion amounts to insane delusion, but the question whether a prejudice on the part of a testator against the natural objects of his bounty amounts to an insane delusion which would affect the validity of his will is one of fact, depending upon whether or not, under all the circumstances, it was such as might have resided in a sound mind, and is for the jury. Greenwood's Case, 3 Curt. Ecc. 337. (g) A fixed idea or belief that one has lost every friend is an incipient form of depressive delusion common to several insanities. 1 Clevenger's Med. Jur., 51.

WOODSON, J.—This suit originated in the circuit court of the city of St. Louis, and was instituted to contest the validity of an instrument in writing, purporting to be the last will and testament of Edward K. Holton, deceased, on the grounds: First, that the testator was not of sound mind and disposing memory, and was, for that reason, incapable of making a valid will; second, that the instrument was caused to be executed by the undue and improper influence of his wife, Lillian M. Holton (now Cochran).

Said instrument is in words and figures as follows:

"I, Edward K. Holton, of the city of St. Louis, State of Missouri, being of sound and disposing mind and memory, do hereby make, publish and declare this to be my last will and testament, hereby revoking all wills by me heretofore made.

"First, I give and bequeath to my brothers, Frank G. Holton and William J. Holton, each the sum of five hundred dollars.

"Second.    I give and bequeath to my wife, Lillian M. Holton, the sum of five hundred dollars in trust for my brother, Albert S. Holton, and to be paid to him as his necessities may require.

"Third.    I give and bequeath to my niece, Lillian M. Holton, the sum of seven hundred dollars, in token of her loyal services to my father and mother, now deceased.

"Fourth.    I give and bequeath to my son, Birchard R. E. Holton, and to my daughter, Alice M. Bright, each the sum of five dollars.

"Fifth.    I give and bequeath to my daughter, Lucinda B. Burrow, the sum of five thousand dollars.

"Sixth.    All the rest, residue and remainder of my estate, real, personal and mixed, wherever situated, I give, devise and bequeath to my beloved wife, Lillian M. Holton, to have and to hold the same to her and to her heirs and assigns forever.

"Seventh.    I do name and appoint my said wife, Lillian M. Holton, executrix, and Charles A. Thompson, executor, of this will, without bond.

"In testimony whereof, I have hereto set my hand this 10th day of November, 1902."

This instrument was duly signed by Edward K. Holton, and attested by three witnesses, namely, George Ringhausen, J. B. Corby and W. Edwin Corby,

and was duly probated by the probate court of the city of St. Louis on the 5th day of December, 1902.

Lillian M. Holton, the widow, was the only defendant who filed an answer. It admitted the execution of the will and alleged the testator was of sound mind and disposing memory at the time of its execution, and denied its execution was procured by undue or improper influence, exercised over his mind by his said wife, and terminated by alleging said instrument was his last will and testament.

The record in this case covers about twelve hundred pages of closely typewritten matter, and the abstracts thereof cover more than six hundred pages.

Appellant contends with much earnestness that the verdict of the jury is not only against the great weight of the evidence, but that there is no evidence whatever in this voluminous record to support the verdict. This contention calls for a somewhat extended statement of the evidence and the facts which the evidence tends to prove.

As to all the facts in the case which existed prior to the death of testator's first wife, which occurred April 23, 1891, there is but little, if any, controversy; and whatever changes took place, if any, as to the testator's mind and memory occurred subsequent to that time. They are as follows:

Edward K. Holton, the testator, was born December 17th, 1843, in the State of Wisconsin, and departed this life in the city of St. Louis, on December 2, 1902, from wounds inflicted by his own hand. He was a strong, vigorous man, weighed one hundred and eighty-five pounds. He dressed neatly and well and had the bearing and appearance of a military man. His first wife was Miss Carrie Birchard. They were married in the year 1867. He lived happily with her and raised a family of three children, namely, Lucinda, Alice and Birchard, the contestants. They were happy, con-

tented and dutiful children. Shortly after their marriage they moved to St. Louis, where he was actively engaged in the mercantile business for a period of about thirty-five years, extending down to the month of August, 1901. He and his wife were regular attendants of the Pilgrim Congregational Church and sent their children to Sunday school, and educated one of their daughters in a Catholic school, and was always interested in church work and the charities connected therewith. He was a dutiful son, a loving husband, a kind and affectionate father, and a good and highly respected citizen. He was a man of fine sense, sound judgment and ripe experience; he possessed a liberal education and had traveled extensively at home and abroad; he was also a man of splendid business capacity and qualifications and devoted to and was attentive to business, and was very successful therein. He was connected with the St. Louis Shovel Company, and left an estate worth from $100,-000 to $125,000. He was active and ambitious, self-willed, strong-minded, determined, impulsive, demonstrative, loquacious, excitable, and inclined to be more or less egotistical. He was fond of his father and mother and supported them during their old age. He was a kind brother and assisted in the support and maintenance of an insane brother. All witnesses for both plaintiffs and defendant testified that he had a high sense of honor and justice and was honest in all his dealings.

His mother, Martha K. Holton, was of unsound mind for four or five years before she died, and lost her mind entirely four or five months before her death. His aunt, Eliza Bradley, his mother's sister, was insane. His brother, Albert Holton, was insane and spent much of his life in an insane asylum and died therein. A cousin of his, Albert Kendrick, was insane, as was also one of Albert's daughters.

The testator was a moderate drinker prior to the death of his wife.

*Charles A. Thompson* testified on behalf of defendant, in substance, as follows: Captain Edward K. Holton and his wife came to my office on November 10, 1902, at my request. I was in the railway supply business. I wanted him to go on my bond to the United States as security for my faithful performance of a contract to be entered into by me with the Government. Immediately upon entering the office Captain Holton, leaving Mrs. Holton in the main office, took me into the inner or private office and explained to me that he intended re-drafting his will and asked me to act as executor along with Mrs. Holton, whom he had named as executrix in a former will which he had with him, explaining that he wanted his wife to have the benefit of my advice in the administration of the estate. He showed me the will which he had made before then. (The witness did not remember the exact date of the will, but it subsequently appeared, by the testimony of Mr. Zumbalen, that it had been executed November 16, 1901.) Holton told me this former will had been drafted by Mr. Zumbalen, a lawyer. Captain Holton asked me for the privilege of having my private secretary or stenographer, Miss Laura Mayhugh, write out the new will for him, which I agreed to. We returned to the main office and Captain Holton sat down in that and dictated to Miss Mayhugh the matter which he wished embodied in the new will, holding the old one in his hand while he dictated. Miss Mayhugh took down the dictation in shorthand; afterwards wrote it out on the typewriter and handed it to Captain Holton, who handed the old will to me, and he and I read back to the old will with the new draft, comparing and checking back from the one to the other. The differences between the will of November 16, 1901, and that of

November 10, 1902, were, that by the former, Captain Holton had given his son Birch and daughter Alice $1 each; in the new will he raised this to $5 each. In the will of 1901 he had given his brothers Frank and William $100 each, and he raised that to $500 each in the new will.   In the will of 1901 he had given his daughter Lucinda B. Burrow, then Lucinda Garnet, $10,000, and in the one of 1902 he gave her $5,000. (Mrs. Garnett between the making of the two wills had married a Mr. Burrow.)   In the will of 1901 his wife Lillian had been sole executrix, while in that of 1902 the witness was named with her as executor. (The draft of this first will of 1901 will be found in the testimony of Mr. Zumbalen.)

Captain Holton then called Messrs. J. B. Corby and William E. Corby and George Ringhausen up from the lower office and asked them to witness his will.   He signed the paper in the presence of these three gentlemen and they signed it at his request and in his presence and in the presence of each other, Captain Holton stating to them that this was his last will and testament.   He then tore up the old one, threw the pieces into a cuspidor, and put the new document in his pocket.   Upon the completion of the business of signing the will and bond, the Captain and Mrs. Holton left the office, having been there from three-quarters of an hour to one hour. Mr. J. B. Corby and Mr. George Ringhausen were clerks in the employ of myself.   Mr. J. B. Corby was twenty-eight years old, and Mr. Wm. E. Corby thirty years old.   (Mr. Geo. Ringhausen's age does not appear in the Abstract.)   I was forty-two years old, Miss Mayhugh twenty-seven.

All of the parties above mentioned were sworn on behalf of defendant and testified that Mrs. Holton made no remarks or suggestions to the testator during the time the will was being drawn and executed.

All testified he was not under the influence of liquor; was perfectly sober; acted as they had known him to act all through their acquaintance with him; appeared and acted to them like a man in possession of all his faculties; dictated everything connected with the drawing up and execution of the will, and declared in their presence it was his last will and testament. All of them knew Captain Holton, and most of them had known him for many years, and all stated that his actions, conduct and appearance on that occasion in nowise differed from what it had been during the years of their acquaintance with him. Each of them testified to his actions, appearance and conduct; not one of them noticed any depression, melancholy or other abnormal symptoms, and they all identified the paper afterwards given in evidence as the paper which had been signed on that occasion by Captain Holton as his will, and had been witnessed by the two Messrs. Corby and by Mr. Ringhausen, and which Captain Holton had dictated in the presence of Mr. Thompson to Miss Mayhugh, and which Miss Mayhugh had written out for him on the typewriter from her notes of Captain Holton's dictation. They all testified that it was the work of Captain Holton alone, unassisted by anyone except the manual act of typewriting which was done by Miss Mayhugh, and the comparison between it and the will of 1901 which was done by Mr. Thompson and Captain Holton, one reading the new draft while the other held the old will, and except that each of the three witnesses signed his own name. Furthermore, the dictation by Captain Holton had been such that when Miss Mayhugh wrote it out on the machine from the notes of the dictation, no corrections had to be made in her work. "Not a letter changed." The instrument produced as the last will of Edward K. Holton, then so executed on November 10, 1902, together with

the affidavits and certificate of probate, were intro-
duced and read in evidence.

This was the appellant's case in chief.

RESPONDENTS' TESTIMONY.

The plaintiffs introduced evidence tending to
prove the following additional facts:

That testator joined the army during the Civil
War, at the age of nineteen years, and served for
two years; that he was very fond of and affectionate
to his children; that the death of his wife was a great
mental shock to him, and after that he began to drink
heavily and continued it to the day of his death; that
frequently he would cry and rave against the Almighty
and say there was no God nor Heaven, and that there
was nothing in religion; that upon one occasion when
his daughter-in-law told him she was a Catholic, he
said there was nothing in it, that the Mohammedan re-
ligion was the only religion in which there was any-
thing; that during the first few months after the death
of his wife he would break out in a laugh, would then
become very profane and then burst into tears and
cry, and again change from tears to laughter, and make
remarks to his son or others who happened to be about
him, "Ain't I a damned fool?" or "I am a damned
fool."

That in December, 1891, his father-in-law died,
which occurred about one o'clock a. m.   On that night
he raved and swore, and declared there was no God;
that his language and conduct upon that occasion were
so violent that his children became frightened and
left his house about three p. m., and passed the re-
mainder of the night at the house of one of his daugh-
ters; that on the next day, when the children returned
home, he made no mention of the occurrences of the
previous night.   Between the years 1891 and 1899 he
remained single and during that time his daughter,

Alice, kept house for him.   In January, 1899, at the
age of fifty-six years, he married a strong, robust
widow of twenty-four or twenty-five years of age, who
had been the stenographer in his place of business
for years.   In September, 1899, his mother met with
an accident, injuring herself quite seriously, and he
went to Milwaukee to see her.   After seeing her, he
went down in the elevator with his father, and on the
first floor he turned to his father in a very excited man-
ner and loud voice said to him, "You old people
[meaning his father and mother] are outliving your
usefulness—you ought to have died seven or eight
years ago."   On this same visit he took his aged fa-
ther and uncle to dine with him in one of the princi-
pal hotels of Milwaukee, and without provocation or
apparent cause began to abuse the waiter, swore and
became very profane in the public dining room, and
otherwise disturbed and attracted the attention of all.
That during this visit his brother, William, met him
in Milwaukee, and during the conversation some men-
tion was made of their insane brother.   He jumped
up and became very violent in his language and man-
ner and said in a loud and threatening voice, "God
damn you.   I will kill you if you oppose me."   That
nothing had been said or done by his brother William
to call forth or justify such language or conduct; that
within a few minutes after this occurrence he was
laughing and talking pleasantly as though nothing un-
pleasant had occurred.   That upon a visit to his fa-
ther, a few days prior to the latter's death. he said
to his father in a loud voice, "You should have died
long ago.   You have lived twenty years too long."
During this same trip to Milwaukee, in conversation
with his brother William as to what was the best way
to care for their aged and helpless mother, he burst
forth with oaths and said in a loud tone of voice,
and gesticulating with his arms: "God damn her,

to hell with her.    If I had my way I would put her in
an insane asylum or poor house.''    That his brother
said to him in reply, ''What do you mean by talking
that way about our little mother, you must be crazy?''
He shouted, ''Don't talk that way to me, Julius Birge
has been in business with me for thirty-three years
and never talked that way to me.''    And upon his broth-
er's reply, ''I don't care anything about Julius
Birge,'' he shouted, ''Yes, Julius Birge; he is a viper,
a snake.    He has been coiling about my neck, but now
I have him off.    I have him off.''    That on the next
day he and his brother met and he never mentioned
the occurrences of the previous day.    That he cared
for and supported his father and mother during the
last years of their lives, and bequeathed to a niece of
his $700, in token of her loyal services rendered to
his father and mother during those years.

     That in 1900 his mother died and he went to Mil-
waukee to attend the funeral, and while in the dining
room, waiting for his breakfast, his brother came in
and said to him, ''Good morning,'' and said, ''Ed,
haven't you been to breakfast yet?''    Whereupon he
became violent in his actions and language, pounded
upon the table with his fist, swearing and shouting at
the waiter.    That upon seeing some flowers his broth-
er had brought to place upon their mother's casket,
he exclaimed, in substance, ''Humph, rot; God-damned
rot;'' and later, while discussing the funeral arrange-
ments, he said: ''I don't want any damn singing, and
cut the services short, damned short; and let there be
no prayers at the grave, and I don't want anybody to
take their hat off at the grave.''    He was finally per-
suaded to let them sing the hymn, ''Nearer My God to
Thee,'' and to offer a short prayer at the grave.    Dur-
ing the singing he paced the floor above like a caged
animal, cursing under his breath.    He carried on in
this same way only more profane and was more unrea-

sonable at the funeral of his father, which was held but a few months before.

That he frequently said he was getting tired of business and wanted to get out of it and take a rest; that he wanted to exchange his stock in the St. Louis Shovel Company for stock in the Ames Company, so he could sell the latter and thereby rid himself of all business; that he urged upon his chief associate in business, Julius Birge, to sell to the Ames Shovel & Tool Company at a less price than Birge thought it was worth, his object being to get out of business; that his associate, Julius Birge, persistently refused to sell for a price less than the business was reasonably worth, which greatly angered testator, and complained to him that he wanted to quit business; that the consolidation with the Ames Company was finally affected, on a basis of five shares of the Ames stock for one of the St. Louis Shovel Company's.

On December 29, 1891, Ezra Birchard, grandfather of testator's children, died, and by his will he left his estate to these three grandchildren, share and share alike, the portion of Alice and Birch, who were minors, going to their father as trustee for them during their minority, the income and revenue to be used for their support and education.     At the death of Col. Birchard, Capt. Holton was indebted to him in the sum of $10,000, evidenced by a note bearing eight per cent interest, and secured by one hundred shares of stock in the St. Louis Shovel Company, of the par value of $100 each.     Under his will, Col. Birchard gave his son-in-law, Capt. Holton, the option of cancelling said note and transferring said stock to his grandchildren, Alice and Birch, in payment of the debt.  On March 10, 1893, Capt. Holton exercised the option and on that day received certificate No. 7 for fifty shares of said stock in his name, as trustee for his daughter Alice, and certificate No. 8 for fifty shares of said

stock in his name as trustee for his son Birchard. Alice became of age in 1893 and Birch in 1898, but their father retained this stock until November, 1901. In December, 1894, immediately upon Alice's attaining her majority, she, under her father's direction, entered into a trust agreement with her father, whereby he was to hold said stock in trust for her until she should reach the age of twenty-five years, at which time the trust should determine and her father should re-assign said stock to her, or in the event of his death before that time the stock should revert to Alice. Said contract provided further that during the continuance of the trust all income, profits and dividends arising from said stock should belong absolutely to the father, provided, that he pay his said daughter, Alice, during every year a sum equal to eight per cent per annum upon the par value of said stock, which amounted to $400 annually. Birch had an oral understanding with his father somewhat similar to the contract with Alice. Between 1894 and 1901 the father collected, as trustee, $13,500 in dividends, and on November 18, 1901, $2,224.77, making a total of $15,724.77 collected in dividends, as trustee. After Alice became of age he paid her under said contract $2,600, and after Birch became of age he made him an allowance of $1,200, making a total of $3,800. Profit off of his *cestui que trustents* $11,924.77. Alice reached the age of twenty-five in December, 1900.

On August 12, 1901, the St. Louis Shovel Company, with four other concerns, consolidated with the Ames Tool & Shovel Company, a Massachusetts corporation, on a basis of the stockholders of the St. Louis Shovel Company receiving a fraction over five shares of stock in the Ames Company for one in the St. Louis Company. When this consolidation took place, Captain Holton undertook to settle his trusteeship and turn over to Alice and Birch the stock which had been left

them by their grandfather.   By this time he believed and asserted, with all the vehemence of a man with a fixed and positive conviction on the subject, that Alice and Birch were only entitled to receive from him stock in the Ames Company of the par value of $5,000.   That amount was the par value of the stock their grandfather had left them.   He told them that he was going to give them all that he received out of the deal with the Ames Company above $100,000, but he designated an issue to himself of $109,300.   (The total stock that he and his children were entitled to receive in the Ames Company amounted to $136,500.   Alice and Birch were entitled to $25,000 each, or $50,000.)   During the last few years of his life he treated this interest which he was paying the children under those contracts as an allowance which he was giving them, instead of interest due them.   That he was one of the proprietors of this same company, owning about twenty-five per cent of its stock.   That by that arrangement the $5,000 worth of stock belonging to each of his children in the St. Louis Company was worth $25,000 of the Ames stock; that they demanded of their father the $25,000 each, but he refused to give them that much, claiming that they were only entitled to $5,000; that the only reason he had for claiming the children were only entitled to $5,000 each was he had formed an idea and believed that he had been paying the children the interest as an allowance, and that it was through his efforts that the St. Louis Shovel Company stock was so valuable; that he was only one of a number who made that company what it was, and that during all the time he was connected with the company he was paid a regular salary for his services rendered, and that he drew his dividends upon the money he had invested therein; that he treated and considered $20,000 of the $25,000 stock which each of the children owned as his earnings and for that reason

he contended that he and not they owned it; that whenever their claim was mentioned to him, he would fly into a perfect rage and swore and cursed them and threatened to disinherit them if they persisted in their claims; that after the children received the amount of stock to which they were entitled in the consolidated company, he complained to almost everyone who talked to him that his children had gone back on him, that they did not love him or respect him, and had unjustly exacted and wrongfully taken from him the $40,000 worth of stock in the Ames Company; that this so turned and embittered him against the children that he said to some that he was going to disinherit them, while he told others that he had provided well for all of them, giving his wife one-third of his property, and the children the other two-thirds. During the summer of 1901 he would frequently go to his friends and cry and complain that he was unhappy.

That about the same time he visited his daughter Lulu, in Philadelphia, and advised her to sell a mortgage she held on property in St. Louis, and when she told him she did not think it best to do so, he became very indignant, raved, swore at and cursed her and said that she did not trust him and that she was afraid he was going to steal her money, and that he became so violent that he took hold of her and shook her and did not cease that conduct until she yielded to his request; that about this same time he visited her again at Atlantic City, and he was sick and remained in bed for two or three days, and during that time he would beat his head, roll and toss in bed, tear the sheets and his nightshirts, and continually complain of his head.

That upon the consolidation of the St. Louis Shovel Company with the Ames Company, Julius Birge was elected manager of the St. Louis branch; testator went into his room and flew into a rage, crying

and cursing and charging Birge, his business associate for thirty-five years, with having kicked him out of business; that he had previously and frequently expressed to Birge and others that he wanted to get rid of all business, and that was the main reason why he wanted to consolidate the different houses.

That in the summer of 1902, at one of the hotels in Chicago, and at Mackinac Island, where he had gone for his health, he met his brother, William, his son, Birch, and the latter's wife, and in the conversation which followed he would jump from one subject to another and cry without any apparent cause; that he was drinking heavily and had been for two years past; that at the hotels he would order certain dishes and when the waiter would bring them he would curse and swear at him and say he had never ordered them, and talked loud and boisterously in the presence of all, notwithstanding that was the first time he had met his daughter-in-law, Birch's wife; that shortly after he complained of being sick and went to his room and his son proposed to call a doctor—he cursed and swore and said he would kill the doctor if he came; that later he went down to the dining room with his daughter-in-law and two of her young lady friends, Miss Ferguson and Miss Jerome, who were strangers to him, and at the dinner table he got into a violent altercation with the waitress and was very violent in his language, so as to attract the attention of everybody in the room. He told vulgar stories to those ladies, to their great shame and humiliation; that after dinner, in the absence of his son, he invited his daughter-in-law and the two young ladies into a saloon to drink. In refusing the daughter-in-law said: "Birch would not like for his wife to do anything like that," whereupon he said, "Wife, wife! You mean woman, don't you?"

That in October, 1901, he was sitting in his chair in his office, when he complained of feeling badly, and

all at once he had a fit, became unconscious and fell back in his chair, and began to froth at the mouth, and his eyes rolled back as though he was dying. Two business friends from the East were present and after restoring him to consciousness they took him home.

That in 1901, at the meeting of the stockholders of the various concerns which effected the consolidation of the shovel houses, he was unable to concentrate his mind for any length of time on any particular subject, and was exceedingly nervous and excitable, and threw up his hands and said, "Let me alone, I am going to pieces." That he was irritable, excitable, unreasonable and without self-control. That during the last two years he was in business he could not concentrate and keep his mind upon his business—he would jump from one thing to another, and was unable to do his work as he did prior to that time; he would get tired easily, could not work all day, would come down to the office late in the morning and leave early in the afternoon, often leaving his work undone, and seemed unable to do detail work during the last year he was in business; that he could not think or talk coherently upon any subject, but would jump from one subject to another.

That in 1901, upon returning home from one of the meetings which was called to consolidate the shovel houses, he threw up his hands and said in a most violent manner that "Julius Birge," his old business associate, "was a skunk and like an anaconda, choking him to death," and at the same time throwing out his hands as though pulling the snake from his neck, saying, at the time, "Thank God; I am through with it now."

That after he was out of business he would talk to his friends about his family and business career. He would cry and say his wife and children did not love him; that they had gone back on him; that he

208 Sup—22

had no friends; that no one cared for him; that he wished he was dead, and upon one occasion said, "Some day you'll wake up and read in the newspapers"—shaking his hands—"Poor Ned Holton is gone, dead." Upon another occasion he said he was sorry he went out of business and wanted to go in busines again with his son Birch, and said to him, "If I go in with you, will you cheat your poor old father?" That in talking over those matters he would be crying one moment and laughing the next, and cursing and swearing the next.

That during the last year of his life he lost from thirty to forty pounds of flesh.     He complained of being lonely, and was despondent and melancholy.

*Dr. Spencer Graves,* an eminent physician who had been practicing sixteen years in St. Louis as a busy practitioner, testified he was the family physician of Edward Kendrick Holton during his lifetime, covering a period from 1892 until his death; that during that time he was called to treat him on an average of three or four times a month when he was in the city; that during the last eighteen months of his life he was called upon approximately seven or eight times every month when he was at home and treated him for catarrh of the stomach, mostly; also neurasthenia, also a nervous condition, insomnia, various functional ailments, colds, and so on; said insomnia is an inability to sleep; neurasthenia is merely a functional disturbance of the nervous system; that he was called to treat him about a week before his suicide, and at the time of his suicide.     That in the fall of 1901 he noticed a change in Captain Holton's physical condition; that he had noticed little peculiarities in his character before he retired from business, but did not take any special notice of any change until after that; noticed no marked change until after he had retired from business.     He had an idea that he was very much alone

in the world; that was one of the things that he harped
on, that he had no companion, that he had nothing to
live for; he talked on that subject a great deal, I
thought that was a little unusual and unnatural for
him.  I noticed that he was more emotional and more
despondent at times.   He manifested this  despon-
dency in various ways.  His despondency was man-
ifested by his telling me how he felt, and perhaps
he would cry.   His emotionalism was manifested by
his being easily influenced to tears.   His emotional
actions and his despondency and his tendency to tears
increased as time went on.   It increased to a sufficient
extent for me to note it and to observe that it was
progressive.   This progression kept up to the time of
his death.   I noticed a change in his physical condi-
tion.   He became more emaciated, very much more
emaciated towards the last; his arteries were hard;
he had atheromatous degeneration of the arteries; he
had albuminuria, and decided symptoms of catarrh of
the stomach; the arteries were not pliable as you find
them in a normal man—rather what we call athero-
matous degeneration.   I do not think there was any
special change in his personal appearance except that
his pupils were sometimes dilated, one of them con-
tracted or one dilated.   There was a change in his
temperament, in his excitability; he seemed to be more
excitable in the latter months of his life, more excita-
ble than he had been formerly.   I noticed he was not
probably so refined in his speech.   He was very moody,
you might call it; he would change from one mood to
another, be crying at one time and talking about a trip
in a few moments.   He would be expressing himself
about the way his children had treated him, and worry-
ing and crying over them, and then in a few moments
he would be talking about a trip to Europe.   He said
all of his children had gone back on him, and did not
treat him with any consideration, did not consider him

honest, and a great many things I could not repeat. I do not remember, just along that line. He had an idea that all his children were persecuting him, apparently, and it seemed to worry him a great deal. Whenever he would talk about it he would cry. "Q. Was that very frequent during the last years of his life? A. Well, generally, when I would see him. About as often as I would see him. I do not remember just the words that he said, but he would dwell upon the subject and talk about it a great deal. He drank to excess during the last two years of his life. The indications of catarrh of the stomach were attributable in his case to alcohol. Q. State what, in your opinion, was the cause of the change in his mental condition and his physical condition? A. I think it was a combination of age and alcohol, too much of it. There might be other things, but these were the only direct things which were called to my attention. Q. How old a man was Captain Holton when he committed suicide, in your judgment? A. I think he was about sixty-eight. I should say his wife was about twenty-five or twenty-four. I think that during the last eighteen months of his life he was of unsound mind. Q. What form of insanity? What would you diagnose the case? A. Senile dementia brought on by alcohol. Q. What is the effect of senile dementia brought on by alcohol, what would be the effect upon his acceding to the will of another, what effect would it have upon a man's will? A. It would weaken his mind in every way; his will would not be as strong as it was formerly. Q. Does that apply to his will power? A. I think it does. I mean that his judgment would be weakened, and that consequently he would be more influenced along lines where his judgment was required; he would be more susceptible to suggestions—such as mental suggestions. Q. Was there any change you noticed in regard to his powers to follow a single subject of conversation? What were these changes? A. He

would change from one subject to another very quickly; change from despondency to a different mood altogether. I mean that when he was talking upon one subject he would suddenly change to another and at the same time change his whole mood. He was weighed several times and told me he was losing weight, but I do not remember just how much; there was a change observable in his face, in emaciation; there was a change. Albumen might be evidence of brain trouble or a great many things. In the form of dementia brought on by age and dissipation or alcohol, the change in the facial expression is not so frequent. There is a difference in senile dementia and other forms of general dementia—difference in the symptoms. Alcoholism is a chronic state of alcoholic poison. Alcoholism has nothing to do with senility, except to produce it, sometimes it brings it about prematurely.'' In 1902 when Birch and his father were talking of going into the banking business, I gave him some advice regarding his father's ability to carry on business.

*Julius C. Birge*: President and manager of the plant of the St. Louis Shovel Company. Has been a manufacturer of shovels in St. Louis since 1867. President and principal stockholder of that company since its organization. He and his family owned seventy-five per cent of the stock. Testified that he had known Edward Kendrick Holton since 1867, and had been on close business and social relations with him during all that time; that their social relations were always pleasant. That he saw him every day at business, their business relations continued down to August 12, 1901, the time the St. Louis Shovel Company was transferred to the Ames Company, and Mr. Holton continued to come down to our place of business, for one or two months after that. Witness noticed no sudden change in his physical condition, but he did notice

a gradual change during the last two years of his connection with the company—that would be in 1900 and 1901. Back of the time of the death of his first wife, Mr. Holton had been an occasional drinker for a good many years. Prior to that he did not think he was an excessive drinker. That he remembered that in the last two or three years his habits had very materially changed in that respect. Witness had known his second wife since she was seventeen or eighteen years of age. She occupied the position of stenographer very satisfactorily to the company until her first marriage. Her first marriage continued less than a year—about nine months—and she came back to them after her relations with her first husband were broken off. Captain Holton told witness about his approaching marriage to her. They went to his house and told him all about it. He drank very heavily in the fall of 1900 and 1901. Witness was on intimate terms of friendship with him during thirty-five years, as much as any man. Witness knew Charles Meyers and Mr. Howard Rowland. They are shovel manufacturers, and Mr. Holton had been accustomed to visit their homes. His relations with Mr. Meyers were always very intimate. Those gentlemen were both directors in the Ames Company, and his relations with Mr. Meyers in particular had dated back probably twenty years. Witness noticed the change in his physical condition. This change seemed to have been later than the change in his mental condition. During the latter part of 1900 and 1901 his mental condition had very materially changed. There is no doubt of that. He was unable for a year previous to the discontinuance of business to concentrate his mind on any business matter for any considerable length of time without a physical—sort of physical—breakdown, stating that he was exhausted and tired and he could not talk on business any more. He lacked the power to concentrate

his mind on any business topic for any considerable length of time. He was very irritable and any proposition which was not in line with his views that needed any discussion would cause him to go into spasms almost, he could hardly control himself. When the spasms passed over he seemed pleasant. "Q. Describe the suddenness of his change? You say he could not follow a single line of thought. Give us some instance? A. Well, my first notice was that it was especially marked during the latter part of 1900 and possibly quite a part of the year; he was neglecting his business very seriously. I talked with him occasionally concerning his habits. As to these paroxysms in which he was very nervous and unstrung, I cannot recall the dates, but they were very frequent and would occur whenever there was any business to discuss, with scarcely an exception during the last year or two of his business career."

I saw him at Atlantic City in the summer of 1901. I was there about two days; he was confined to his room. I ate at the table with him and his wife. I had conversation with his wife with regard to the stock that was to be issued in the consolidated company. She told me about what a hard time she had had on her trip to Europe with him, and I told her she ought to have some of that stock. She asked me to speak to Captain Holton about giving her some stock and I did. She stated that his condition made the trip a very hard one for her; that his condition was of such a nature that it required her constant attention for every moment.

During the negotiations preceding the organization of the Ames Company we had five or six meetings in New York, lasting four or five days each. Mr. Holton had for a year or two been very desirous of having a consolidation of the manufacturers which went into the Ames Company. All the manufacturers of

shovels. A proposition had been made for the consolidation and Mr. Holton persistently urged that he was tired out and wished to get out of business. That was the burden of his remarks for consecutive months, nearly every day, as he would come into the office during 1901. At those meetings he did at times attempt to participate in the discussions. He was in the meetings only a portion of the time.

In July, 1901, at one of the meetings he was drinking heavily, and one evening I went into his room, which was adjoining mine, to talk the matter over, and he was in such a rage that he was threatening and shook his fist in my face and called me names that I had never heard him call me before. I went up and got Mr. Rowland and Mr. Meyers, who were old friends of his, who had been watching him during the day, and they talked with him for hours, and, in the course of time, Mr. Holton says, "Yes, Birge is all right. He has always done right by me. We have been together, old friends, for thirty years," and he put his arms around me and cried, and it was all made up, and the next day he was very pleasant. Nothing had taken place to bring on that rage except, as I expressed it to him, he had become infatuated with the one idea of making the arrangements with those other parties to consolidate the plant regardless of any basis whatever. Mr. Holton never before expressed any lack of confidence in me. I don't think he ever accused me of personal unfaithfulness or perfidy in any form whatever up to that time.

That meeting adjourned and another was held about three weeks later. Mr. Holton, previous to the agreement, was not in a condition to transact business. The man was in a delirium, as I supposed, from drink. We endeavored to hold him down from doing himself or anyone else violence. His talk was incoherent; he was cursing me because he thought I would not let him

have a respite from the labors of this world. He wanted to get out of business, and by accepting this arrangement he would get stock in the new company. He says, "I can sell that and then I can rest."

We remained at the hotel another day. Mr. Holton would now and then go into the meetings a few minutes, and was entirely friendly with me next day, but he did not seem to have any distinct recollection of what had occurred.

On one occasion we had adjoining rooms at the Waldorf. About two or three o'clock in the morning he came into my room and sat on my bed; he was in a broken down condition. He began to talk with me about his affairs and he cried, shed tears on my bed. I suppose he was there for an hour and a half or two hours. He laid down on my bed a little while. I could not tell what he was shedding tears about. I asked him and he said, "You have a nice home, and here I am a poor, old fellow." I could not understand why he was crying; he could not give any reason. "Q. He was married at that time and had a wife? A. Yes, sir. Q. Did he relate any of his trouble to you? A. No; no point to anything I could get about his troubles. He only felt badly. I think he cried nearly all the time he was there."

At one meeting he called me out into the hall, around to a sort of retired place, and he talked to me very severely about my lack of promptness in accepting the proposition that had been made to us; said I was a darn fool for not taking it up. He used his usual profanity. He was very severe; said he thought he had worked hard enough. He talked so loud that the other gentlemen who were at the other end of the hall complained. I was unable to keep him down. On that occasion I had, before coming to the meeting, stopped in Philadelphia to see Mr. Rowland. Mr. Myers was to be there and they did not

wish Mr. Holton to be there because they wanted to do some figuring. Mr. Holton learned, through me, that I had been to Rowland's factory, and we went into the ladies' cafe for dinner and he talked to me so loudly there that it was necessary to leave the room, cursing me because I had gone there by stealth, as it were. I told him that he had been accustomed to go there very often, and that my motive was simply to get data for our mutual benefit. These gentlemen were all with me and they told him about it. His manner was very remarkable in the ladies' cafe by reason of the fact that he talked to the limit of his voice and was apparently entirely unconscious of the presence of anyone besides himself. "Q. Do you remember any other occasion that indicated to you a change? A. Yes, sir; there were a good many, but I think we have had enough."

One Sabbath we were at Coney Island. Mr. Holton roomed with Mr. Meyers and someone else. They took a big bed room with three or four beds in it. He had been drinking during the night. I do not recall the conversation there. There was considerable conversation, but I do not recall the nature of it. I saw what he had been doing during the night; I saw his bottle. I guess it was as much as a pint; it was a fair-sized bottle; I did not handle it, but they said he had emptied it.

There were eight or ten occasions when he threw his arms around my neck, and cried, but I would not state when and where. It was when he would become angry and then get over it. "Q. You began to notice the change in his mental condition about 1900, now state in what way, other than already stated, that condition was manifested? A. I have stated a number of ways. I have stated that he would be unable to talk on business for any length of time without breaking down. He would generally throw up his arms and say, 'Let me alone; I am tired,' in that manner. Those

paroxysms were very frequent; they were very frequent. They were universal; absolutely universal.''

After his marriage to his second wife, he told me he was going to make a will and give two-thirds of his property to his children and one-third to his wife. That was within—I think—was within three years of his death.

Mr. Holton was very demonstrative, very affectionate to his children and his whole family—he was to me. I knew very little of his domestic life the last year of his life, but I think his relations with his children, as far as I could see, were as pleasant during the last year of his life as at any time before. They had their troubles. He expressed himself on several occasions very bitterly towards his children by reason of their insistence on the amount of stock in the new company which was represented by their stock in the old. I cannot quote you verbatim what he said, but he said on two or three occasions that his children had gone back on him and I endeavored to reason the matter and he apparently wouldn't listen to any reason or explanation.

Mr. Holton held fifty shares of stock of the par value of $5,000 in the St. Louis Shovel Company as trustee for his daughter Alice, and fifty shares of the par value of $5,000 as trustee for his son Birchard. He was entitled as such trustee to receive stock of the Ames Company in exchange for this stock, $15,201.46, par value, preferred stock, and $10,128.20 in common stock, making a total of something over $25,000 par value he was entitled to receive as trustee for his daughter Alice, and the same amount for his son Birchard. He had 173 shares of his own in the St. Louis Shovel Company, and for that was entitled to receive from the Ames Company something over $51,900 par value of preferred stock and $34,600 par value of the common stock, a total of something over $86,500 par

value. As a matter of fact, on October 23, 1901, he ordered $39,300 common and $70,000 preferred to be issued to Edward K. Holton and $7,000 preferred and $8,000 common to be issued to Alice M. Bright and $6,000 preferred and 8,000 common to Birchard R. E. Holton. The balance which should have gone to Alice and Birchard was issued to himself individually. Between 1894 and 1901 on the 100 shares belonging to Alice and Birchard he collected $13,500 in dividends of $6,250 each. On the 173 shares belonging to himself he collected $21,355 in dividends, and on November 18, 1901, in addition to this, collected on the 273 shares of all $6,069.80 in dividends.

"Q. Did you notice any change in his facial expression? A. Yes, sir, I did. Mr. Holton's facial expression was very variable, I thought. It was changeable from day to day. His eyes had an expression that was very unpleasant. The pupils seemed to be dilated and he had a wild, bad look. Sometimes, it was, I thought, expressionless. Q. Well, would there be any change from one to another in rapid succession? A. Very rapid indeed. He would be very much excited at one moment and his expression would indicate a desire to do violence, and his movements and everything, and in a few minutes he would be as affectionate as he was in his better days. He was always a very affectionate man; always was to me, at least. I don't think I ever had a difference with Mr. Holton except over some temporary business matters, in my life, until, perhaps, one occasion."

A meeting occurred in Boston. I think it was in October, 1901. Mr. Holton was present; all the stockholders or representative stockholders in the newly organized company were present. I declined a nomination for vice-president. I was elected subsequently as manager of the St. Louis plant. I had no thought that Mr. Holton desired it, because he had always said

that he wanted to get out of business. No one nominated him and I never invited a nomination. I was the largest stockholder in the St. Louis plant, held a majority of the stock, and I accepted the election as manager of this plant. After the meeting, Mr. Holton made a remark in which I saw that he was very much displeased. I asked him to go to his room in the hotel. I went with him. In substance, he expressed surprise that he had not been elected as manager. I recited what had occurred in our former conversation concerning his desire to get out of business; that he had never in the world intimated a desire to become manager of this plant. I referred to his condition, etc., and he turned on his heel and went into a paroxysm of rage and anger that made me feel very badly. I told him that we had been friends for many years and that I would rather make any sacrifice than have anything of this kind occur. It was the first occasion where he had exhibited a feeling towards me which was enduring.

After the St. Louis plant became a part of the Ames Company, Mr. Holton came to the office, I think, on the 18th of November, 1901, and desired to settle up and be let out, and he was paid all his salary and all that was due him as trustee for the children. He was paid his salary till January 1st. I paid it out of my own pocket. I think I had called at his house very soon after that. I had written him a letter concerning a mistake on an allowance which he had made to some jobbers, which changed the condition of the figures on the books, and which he had not advised me of. By making these allowances it would make a difference in the amount which should have been paid Mr. Holton of several hundred dollars. He never answered the letter. I called at his house. I don't think I had it in mind speaking about the matter particularly, and I never did speak with him concerning the matter, al-

though no attention was given it. At the house I saw Mr. and Mrs. Holton. Mr. Holton was in the room reclining in a chair. Mrs. Holton told me he was unable to come down, and that I must not talk business with him; that when he talked business he broke down and went to pieces. That was in December, 1901. I remained in the room for half an hour. His condition was bad. He appeared weak and broken down. I talked no business with him whatever. Our conversation was pleasant. Mrs. Holton stood right by his chair and seemed to be attentive to him.

Correspondence was introduced, Exhibits 1, 2, 3, 4, and 5, showing that on November 18, 1902, a letter had been written to Boston directing the transfer of 195 shares of stock in the Ames Company from Mr. Holton to his wife, directing that the dividends on both his stock and his wife's be sent to the Third National Bank of St. Louis, and stating, "Our bank account is a mutual one." (The evidence showed they had no mutual bank account.)

That on November 19th a telegram had been sent to Boston as follows: "Express to my wife, Lillian M. Holton, stock certificates," and on the same day a letter was written directing that the certificates be sent to his wife, Lillian M. Holton, whereas the letter the day before had directed them to be sent to 4126 Westminster Place. The letter of November 18th was in the handwriting of Mrs. Holton, but signed by Mr. Holton. In the telegram and letter of November 19th, the signature and body of both were in the handwriting of Mrs. Holton.

But the stock which was issued to the children, as I told him at the time, was not under his control, which ought not to be to that extent, and I went home and talked to my wife about the matter as to what I ought to do.

It is not a fact that Captain Holton claimed to me

that what he wanted to do was to have $100,000 in the award of the Ames stock in his own name; that his surplus stock over and above $100,000 he was perfectly willing to distribute to the children. The facts are not consistent with that, because he ordered $109,300 issued to himself. That was before the controversy with the children came up. Mr. Holton was a very positive and self-assertive man—he lacked that self-assertive quality in the later years. He was a man of strong will; that is, in his better days, and earnest purpose.

During the close of the deal for the trust, Captain Holton was drinking a great deal. He was drinking regularly every day. There were periods when he would evidently drink to a very great excess. He drank too much all the time. He drank so much that it overcame his will power. "Q. Made him tight? A. Well, I think I know the difference between a man who is intoxicated and the after-effects of a period of debauch."

I was absent from the city when this letter apportioning the stock was written, and when Mr. Holton gave his reason for apportioning it as he had. He said that he was entitled to $70,000 preferred stock. His idea was that it belonged to him and he had a right to it; that he had a right to it by virtue of his having given his time to the business, I suppose, and his talents and energy for years, but during all these years he drew his salary as an officer of the company, for his services, the same as I did. I had talked with him about this matter after the stock was finally issued to the children. He said that the children had gone back on him, and he talked very bitterly concerning the actions of his children. He did not particularize in what respect the children had gone back on him, but there could not be anything else I suppose except this incident. I know of no trouble that they had. I en-

deavored to pacify Mr. Holton concerning that matter —to make him—I didn't think he looked at the matter as he ought to, that is the fact of it.

"The COURT: Did you tell him so? A. Yes, sir, I did. I always regarded him as a man of strict integrity. He was particularly so in his early life. I don't know as I ever saw him do an act that was not very nearly square."

It was Mr. Holton's custom to take a bottle with him when he was away, to his room, and when we would have rooms together, and when we traveled together.

It was shown by documentary evidence, witness identifying handwriting and signatures, that Edward K. Holton exercised the option given him in the will of Ezra B. Birchard, to cancel a $10,000 note which he owed Birchard, and on which Birchard held $10,000 par value stock in the St. Louis Shovel Company, as collateral security, by transferring to himself, as trustee for Alice M. Holton, now Bright, fifty shares of stock in the St. Louis Shovel Company of the par value of $5,000, and to himself as trustee of Birchard R. E. Holton, fifty shares of stock in the St. Louis Shovel Company, of the par value of $5,000.

Mr. Holton's income consisted of his salary in the St. Louis Shovel Company, $3,000 per annum; in the Seymour Manufacturing Company, of $800 a year; dividends of $300 or $400 a year in the Seymour Company, and dividends on the stock which he held, both individually and as trustee, heretofore mentioned, amounting to $40,924.80, between 1894 and November 18, 1901.

Witness did not think Mr. Holton was a man of sound mind the last year prior to November 10, 1902.

*Charles H. Meyers,* of Beaver Falls, Pennsylvania, and Howard Rowland, of Cheltenham, Pennsylvania, were sworn on part of plaintiffs and stated that

they had known Captain Holton for many years and
had done business with him during that time.   Both
corroborated the testimony of Mr. Julius Birge, and
thought the testator was of unsound mind at the time
he signed the will.   Also Walter Birge and John B.
Gundolfo had known testator for many years and had
been associated in business with him during that time,
and they were sworn on behalf of plaintiffs and fully
corroborated the evidence of Julius Birge in all mate-
rial parts; and stated that, in their judgment, testa-
tor was of unsound mind at the time he signed the
will.

*William J. Holton,* a brother of deceased, and one
of the defendants in this case, to whom a bequest of
$500 was given under the will, testified that he was
manager of the oil stove department of the Standard
Oil Company in Chicago.   That his brother at the time
of his suicide was in his sixtieth year.   His father's
name was James Holton; mother's maiden name Ma-
ria Kendrick.   His brother's middle name, Kendrick,
was taken from his mother.   That his mother's mind
was affected, and he thought it was caused by her anx-
iety and worry over his brother Albert, and also his
father's death.   Witness saw his brother E. K. Holton
in November, 1899, at the Plankington House, Milwau-
kee.   His actions were boisterous and profane at ta-
ble.   Mrs. Holton threatened to leave the table unless
he kept quiet.   He acted to witness like an insane
man.   He certainly was not staggering drunk or any-
thing of that kind.   Witness said, I saw him the next
day at the house, where he came to bid our father
goodbye.   He came into the room in a sort of boister-
ous way, and came up to father and told him he had
to go back to St. Louis, picked him up in his arms, bid
him goodbye, said, "You'll pull through all right;
cheer up."   Shook hands with me and left, and told

208 Sup—23

me to notify him if father got worse. I said, "Ed, I don't think you had better go. I think father is on his death-bed." He pooh-poohed the idea, and said, "Pooh-pooh, he'll pull through all right." Father died the following Monday, November 20, 1899, and he came up to father's funeral on the 21st. At that time his condition was very excitable, nervous and boisterous, especially at the funeral. He said he did not want any long sermon preached, or any prayers at the grave; that it was all rot; and he would be damned if he would have it, and if we didn't tell the minister to cut it short, damned short, he would interrupt the services. We pleaded with him; told him father was one of the old settlers, and all the old settlers would attend the funeral, and begged him not to interrupt. "Well," he says, "I can't sit still; it's got to be damned short. I don't want any prayers at the grave either." I finally persuaded him to have a short prayer at the grave. He says, "Don't anybody take off their hats. I don't want anybody to take their hats off and chance taking cold. It's all tommyrot to take off hats at the grave." He behaved more like an insane man to me. After the funeral was over he went to my mother's, and he invited me down to the Plankington House, where I saw him that night in his room. I came in and he greeted me pleasantly. He rang for the bell boy, ordered up drinks and he had his drink. I said to him, "Well, Ed, father is gone. I never expected him to die first. I thought our little mother would go first. Now, what are we going to do with her?" He says, "To hell with her. I wish to God she was in hell, God damn her. If I had her here I would put her in the insane asylum or the poorhouse. God damn her. She has been crazy for years." I jumped to my feet in astonishment, in perfect horror. I told him to stop. I told him I wouldn't listen to such talk. I says, "My God, man, you are insane to

talk about our little mother that way. You ought to be ashamed of yourself." I says, "Whiskey has just ruined you, is making you insane. Why, at your time of life, going down the hill of life, the way you are drinking you will be in an asylum in less than a year if you don't quit." He says, "Don't talk to me that way, Julius Birge and I have been in business thirty-three years—he never talked that way." I says, "I don't give a damn for Julius Birge—I am talking to you and not Julius Birge." He says, "Julius Birge, God damn him, G-o-d damn him, he is a viper, he is a snake; he has been around my throat for thirty-three years, but I have got him off now (indicating throwing something off his neck). Now I am free, free. God damn him." That is my brother's words and actions.

The next morning at the cafe in the Plankington House he received me very pleasantly, and seemed to have forgotton all that had passed the night before; in fact, met me with a smile, shook hands with me, and we sat down at the table together. In a moment he said to the waiter, "Where in hell is my breakfast, God damn it, where is my breakfast; why in hell don't you bring my breakfast? I have been waiting here an hour." The waiter says, "I beg your pardon, it's only twenty minutes, and it has to be cooked." He beat the table, and finally the waiter brought it in. I says, "Ed, don't talk that way, why don't you keep quiet?" After the waiter brought it in, he said, "That's all right old man, here's a quarter for you; don't mind me—don't pay any attention to me at all."

After breakfast we went out to see mother together. He says to mother, "Now, mother, what do you want to do?" She says, "Well, I want to go to house-keeping." He says, "Well, I don't see how you can—no one but you and Lilly. You better board." She says, "Well, I will not board here." He says, "Well, by God, you will go where I want you to, here

or any other damn place." He says, "God damn it,
you will go just where I want to put you." I says,
"Ed, now you stop, I am in position to care for our
mother; if you want to .desert her now, you do so."
He looked at me in a kind of wild way—says,
"Humph"—he jerked his shoulders as much as to say,
"Yes, you are." Finally he said, "Now, mother, you
can do just as you please. I have got to go back to
St. Louis but whatever Willie does will be satisfac-
tory to me. If you want to board or whatever you
want I will leave it here in Willie's hands." He
quieted down and put his arms around mother and
kissed her. Mother was very much astonished and
shocked. She didn't seem to realize the way he spoke
to her. I attributed it to the condition of her mind.

"Q. Now, on the occasion that you refer to where
he broke out against Julius Birge, what, after his out-
burst, as you describe it, did he do; was there any
change then? A. Oh, he cried. He would cry; and
order up drinks while there—in less than an hour he
must have had seven or eight drinks."

The next day uncle William Kendrick was there.
He and my brother were examining father's papers
and he called for whiskey. There was a bottle of
whiskey that I had bought for my father, a quart, but
there had not been more than a whiskey glass taken
out of it I guess. My neice, Miss Lilly Holton, got
the whiskey for him, and, while we were sitting there,
probably an hour and a half or two hours, he alone
finished the balance of the quart. I saw him that night
at the Plankington House; he was fuller then than I
ever saw him in my life. In three quarters of an hour,
he must have taken seven or eight drinks. I noticed
him wabbling on his legs, the first time I ever saw him
staggering. Still he was erect, with head up in the air,
coat buttoned up, Prince Albert, silk hat, very com-
manding figure. Saw him the following Sunday, No-

vember 26, 1899, at Mrs. Noyes' house, where we had been invited to dinner. He said to me, ''Willie, if you will promise me not to oppose me in regard to Albert, and let his wife get her divorce and the property (which was a house and lot), I will promise to provide for Albert as long as I live and will leave him well provided for in my will, if I die first.'' I said, ''If you will provide for him so that he will never want, I won't oppose you.'' He says, ''I will, and I will provide for him well.'' Then he says, ''Don't you oppose me, because if you do, God damn you, I won't do a damned thing, he can go to hell for all I care.'' I said, ''Now, Ed, there is no use raising your voice, you can't frighten me.'' He jumped to his feet and says, ''God damn you, I will kill you.'' I says, ''I guess not.'' And Mrs. Noyes stepped between us and begged him to sit down; and he said, ''Are you going to oppose me in it?'' I says, ''I told you I wouldn't if you would promise faithfully to provide for Albert.'' I have forgotten just what occurred, but he came up a second time and was very profane, God-damning me in everything, and Mrs. Noyes stepped between us again. Just then dinner was called. Witness was so much disturbed over the incident that he did not eat much, but at the table his brother turned to him and was in a jovial frame of mind, laughing and joking with all and said to witness, ''Are you going out to see Albert?'' I told him yes. He said, ''I would like to go out too, but I can't. I have to go back to St. Louis. I would like to see him. Remember me to him. I wish you would take out some cigars for me to him.'' I started out to the asylum and he followed me out to the hall, and he said, ''Willie, I bid you goodbye,'' and he extended his hand. ''Remember me to Albert; try and go to see him as often as you can.''

In March, 1900, I saw him the day of our mother's funeral. I bought some flowers, and laid them on my

mother's casket. He went up and my cousin said to him, "This is from Willie." He said, "Humph, what in hell does he want to buy those for; all rot, damned rot." Then he said to Mr. Noyes, "Did you get the minister?" Mr. Noyes said, "Yes. I also engaged the choir for Calvary." He said, "I don't want any damned singing at the funeral." Mr. Noyes said, "Now, Ed, we want this singing. Mother was fond of 'Nearer My God to Thee,' and I have requested them to sing it, and hope you aren't going to interfere." He said, "Well, let them sing that but no more. I want these services damned short." I said, "Now, Ed, look here. Our friends are here, this is the last of our little mother. The friends are going to be upstairs, you can go up there and roam around just as much as you please; we are going to have a service." He looked at me, and says, "Who is doing this?" I said, "I don't care, we are going to have a service." He said, "Make it short. I don't want any damned prayer at the grave either." I said, "There will be prayer at the grave." Finally, I persuaded him to go upstairs, and he walked up and down the hall, cursing under his breath, speaking to some of the relatives. He acted like a caged animal. After the burial he was excitable and drinking a good deal. I saw him that night at the Plankington House. He was nervous, excitable and boisterous. That was March, 1900. As far as looks went he was very commanding, fine looking, head erect, as I had always seen him for years, as far as his figure went at that time.

I saw him next at the Auditorium Annex, Chicago, August, 1902. I was thunder struck at his physical condition when I saw him; the change was so great. He seemed to have grown smaller, at least emaciated, stooped. He walked with a shuffling gait; wasn't the same Ed as of old. He appeared to be mentally weak. I told him I was glad to see him, and said "Ed, you

are growing thin." He said, "Yes, I am thinner than I was; I don't weigh as much." I asked him if he had seen Birch's wife. He looked kind of blank in the face as if surprised. I had been told he knew Birch was married, so I thought it strange at the time. I said, "Birch promised to be here to see you." "Well," he says, "He hasn't come. He don't want to see me any more; he don't give a damn for me." I said, "I know that Birch loves you. All your children love you." He said, "My children don't give a damn for me." I said, "Look here, Ed, the only thing you have got against Birch and Alice is that they made you give them what was coming to them, which was no more than right." He says, "No, by God, it wasn't right; that wasn't all coming to them; they made me give up what wasn't theirs." I told him we wouldn't argue that. That Birch wanted to see him, and that no doubt he had been over here, and they probably told him the same thing they told me—that you were not here. Birch said that he had been over there, and they told him he wasn't there. I brought Birch over, and he went right to his father and says, "Papa, how do you do?" His father met him with all the affection a father could meet him with and said, "I am glad to see you, Birch," and turned to his (Birch's) wife and said, "Daughter, I am glad to see you." That was the first time he had met Birch's wife. He went to his room and commenced to tell us about his troubles, and then he commenced to cry. He cried and then commenced to cough. Had a terrible coughing spell. I thought he was going to choke. I said to him, "Ed, what do you mean by traveling alone? Where is Lillian?" He said, "She has traveled 16,000 miles, and by God she can't go any further." He wanted me to go to Mackinac with him, and I told him my clerk was off on a vacation and I could not go, otherwise I would be glad to go. Then he commenced to cry again, and

jumped from one subject to another. Would tell us a little while of his troubles, then he would turn to Birch and talk to him about going into business, then he said, "Willie, I am proud of you, to think that you have got to where you have without the assistance of any of your friends." He said, "Albert, I provided well for him; he will never want as long as he lives. I have left him fixed in my will so that he will never want." (The bequest to Albert, the insane brother, was $500, to his, Mr. E. K. Holton's, wife, not Albert's wife, "to be paid to him as his necessities may require.") Said to me, "You aren't forgotten." Turned to Birch and said, "You are all remembered." Kept ordering up drinks every few minutes. We were there three-quarters of an hour, and he had five or six drinks, if not more. Finally we went down stairs. He put his arms around Birch's neck, and said, "Goodbye, my boy, I will see you in Mackinac." We were in that room about three-quarters of an hour. He swore a great deal, although Birch's wife was present, without apologizing for his language. He didn't carry on any one line of thought for any length of time; would jump from one thing to another; start in and tell about his travels, then he would commence to cry; then he would brace up and start about something else. I never saw him alive after that. The first I heard of his suicide was on the morning of December 3rd. I received a night message, sent the night before, from Mrs. Holton, saying Edward had passed away at seven o'clock. I came down here, went out to the house, asked Mrs. Holton what caused his death. She said that he had committed suicide. She said he had been in the habit of lying in bed two or three days at a time; that this day he lay in bed until noon; got up, dressed, and said he was going down town. She wanted to know if she could not go with him. He said he was going to see some of the boys at the Legion of Honor.

That he came back about 4 o'clock. She let him in; took him into the parlor. Said she had a premonition that he had bought a pistol while he was out. She asked him, "Captain, did you buy anything while you were out?" He said, "Just a couple of cigars." She said she kneeled down in front of him as she had been accustomed to do, ran her hands under his vest and coat, around his waist, and felt the butt of a pistol, suppressed a scream, drew back quickly, and says, "Captain, you have got a gun; what did you buy that for?" He said, "To protect us from burglars." She said, "You better give it to me." "Oh, no, this is mine, I guess I will go to my room." Went up and she followed him. He went to the bathroom, took out a cigar and reached to light it. She thought she had a good chance to get the gun and reached for it; he threw his hand back and she thought he flourished the gun—she wasn't sure, she thought he drew it and flourished it. She rushed downstairs to get help, got to the foot of the stairs, heard the pistol shot, then a second shot.

Based on the facts he had enumerated to the jury, witness said he was of the opinion that his brother was insane. He had not only formed the opinion, but expressed it to the family and to others.

The evidence of William J. Holton was fully corroborated in the main by Lillian A. Bridge, nee Holton, the niece of the testator, mentioned in the will, and by Wm. H. Kendrick, an uncle of the testator.

*Alice M. Bright,* youngest daughter of Edward K. Holton, testified that she was born in December, 1875. That her father and mother attended church together, and after her mother died her father sent the children to Sunday school and church. That the home was kept together about a year after her mother died, and that one summer after that she kept house for her father. After that she lived with her sister, Mrs. Garnett, now

Mrs. Burrow, and that her father and brother, Birchard, boarded together. That she was married in June, 1896. That she went to housekeeping about four months after she married. That her father visited her continually after she went to housekeeping; that she had no unpleasant relations with her father up to the time of his marriage to his second wife, nor until the summer of 1901. He was always loving and affectionate towards the children.

Testified to her father's actions indicating his unsoundness of mind after the death of her mother and grandfather Birchard, substantially the same as shown by the testimony of Mrs. Burrow herein set forth. That the Christmas before her father married Miss Kelly (Mrs. Lenori) he said he would like to have Christmas dinner at her house with his children and gave her ten dollars to get the dinner. That while he was there he said, "Well, this will be our last dinner together; I am going to be married." He asked us all if we would consent to the marriage, and we said if it would make him any happier we would be pleased for him to marry. I went to the wedding. We visited each other after the marriage about once a week. During the summer of 1901 my father had been drinking a great deal more than he had previous to that. I noticed a physical change in my father two years before his death. I noticed a change in his mental condition six months prior to the stock transaction, which was in the summer of 1901. When the St. Louis Shovel Company went into the trust, he said that I really was entitled to $5,000 of stock in the trust, and that he would give me $16,000, and that he would make me quite independent. He kept on changing about the amount he was going to give me, and I really didn't know how much I was going to get, and he didn't seem to be settled on the amount, so I thought I would inquire. I went to Mr. Birge and got an idea about how much

it would be, and had my husband telephone over to the St. Louis Shovel Company, and I found that it was five to one. I went over on several occasions to see my father about it, but he always was irritable and acted so peculiar that I was afraid to speak to him about it. I thought I would wait until he felt like speaking to me. So on Sunday afternoon I went over to his house with my husband. I had no sooner gotten into the house until he said he had decided to give me $15,000. I said, "Papa, is that all there is coming to me?" He says, "Yes, that is all. You really are only entitled to $5,000, but I am going to give you $15,000." "Well," I said, "Papa, it is more than that, I know, that I should get." He says, "How do you know that?" and looked at me in a blank staring way without any expression in his face whatever; he was astonished at what I had said. He says, "How do you make that out?" I said it was five to one the stock was listed at, and with that he turned to my husband and said, "Warren, come upstairs, I have some papers to show you." He turned to his wife and said, "There it is again, some more trouble for me to rack my brain." He began to swear and went upstairs. When he came down stairs he swore and walked up and down the floor and cursed and used such terrible language. At the time I was in a delicate condition and I could not stand such a scare and had to leave the house at once. He claimed legally that I was only entitled to $5,000; that is what he said. He said that was all I could get. He looked astonished at me, and didn't understand that there was more coming to me. He acted like he didn't know anything about it. Looked at me in an astonished way. I told him that there was five to one instead of three to one. He said, "How do you make that?" Everytime I saw him after that (referring to the fact of his stating he was going to keep $100,000) he says, "I don't know how much I am go-

ing to give you; I don't know whether I will give you
$16,000 or $10,000, or how much—you are entitled to
$5,000." He never said a word about his will in con-
nection with the fact that he was going to give me
about $16,000. He said he would provide well in his
will, would remember us children at all times. That
was not in connection with our letting him keep $100,-
000. After he came downstairs, showing my husband
papers, he walked up and down the floor and swore in
such a rage, and said that I would have to be satisfied
with what he would turn over to me, or I would get
just $5,000 that belonged to me. I said, "Papa, I think
I ought to have what my grandfather left me, and I
certainly intend to have it; and if you aren't willing
to give it to me, I will have to see you in court about
it." I made some similar remark like that. After that
Sunday I saw my father quite often, very often he
came to my house and I went to his. That continued
until the last Sunday in February, 1902, before he went
to Europe. On that Sunday he and his wife came over
to my house to say goodbye. I threw my arms around
his neck, and asked him how he was feeling. He said
he was not feeling very well. He went upstairs, he met
my little girl at the head of the stairs, and he played
"bear" with her a few minutes before coming into the
room. We got to talking about how free my brother
was spending his money at the time. And he looked
and glared at me and got up out of his chair, and
shook his fist in my face, and told me he never wanted
to lay his eyes on me or a blank one of his children
again. I became very much frightened, and went into
the other room. Lillian, his wife, walked in behind
me, came up to me and said, "Now, Alice, don't cry,
for your father is not responsible for what he says or
does." "Q. What did you do when he shook his fist
in your face; what did he say about your connection
with your brother getting what he did? A. He said

it was something that didn't belong to him, and shook
his fist.  He swore and cursed and went into a passion
of anger and rage.  And he left and didn't say good-
bye.''  He swore all the way downstairs, cursing my
husband and all of us, and left right away.  Left his
wife there, and she had to borrow car fare to get home
on.  That was the last Sunday in February, and my
child was born March 11th following.  He shook his
fist in my face and he said he never wanted to lay
eyes on me or a blank one of his children, and swore,
and I can't say the words.  I became very much fright-
ened, and I got up and began to cry, and started into
the other room.  My father was not back to my house
ever after that.  I never saw him again.  He said he
never wished to see me.  Mrs. Holton never asked me
to go and see my father.  No, sir; she did not.  She
came to my house and I said to her, ''Don't my father
ever ask for me; don't he ever say anything?''  She
says, ''No, never.''  That is what she said.  She said
he wanted to see my baby.  And I said, ''Tell papa,
to come over to see it.''  She told me that just five
days before my father died.   If I had ever gotten a
word from my father that he wanted to see me I would
have gone in a minute, but I never got the word.  I
asked her if my father wanted to see me; she said he
never spoke of me.  I asked her every time she came
over to see me.  I always asked her about my father,
and every time I would ask her she would always say
that father never said anything about me, never said
he wanted to see me at all.  I told her to tell papa to
come over and see the baby, but he never came.  After
that Sunday they went abroad.  I called at papa's
house and found from Mrs. Kelly that he was back,
and at French Lick.  I saw Mrs. Holton frequently
after that, and asked her every time about my father,
but she said he never said anything about me; never
said he wanted to see me.  Mrs. Holton told me that

my father drank continually; that he was always having bottles with him in his room when he went to bed, and that she had to hide the bottles.

Witness identified Exhibit 8, a contract which her father had her sign when she became eighteen years of age, dated the 2nd day of January, 1894, in reference to her $5,000 stock in St. Louis Shovel Company. Said she knew nothing about the "whereases" in the contract. The contract was in substance that her father should hold this $5,000 stock in trust for her until she arrived at the age of twenty-five; that during that time he should pay her $400 a year (eight per cent interest on $5,000), and when she arrived at twenty-five the trust should be terminated, and he should re-assign the stock to her. The trust terminated by her reaching the age of twenty-five in December, 1900, and she waited until October, 1901, for the re-assignment of this stock. Her father took the dividends thereon after she arrived at the age of twenty-five, which dividends she has never received.

The evidence of Alice Bright was fully corroborated by that of Birch Holton and Lucinda Burrow, son and daughter of testator. And, among other things, *Mrs. Burrows* testified to the following matters:

"MR. RULE: At the time of the death of your mother was there any change in your father's actions toward his children, immediately after the death of the mother? A. No. Q. Was there any change that you observed in his mental condition at that time? A. Yes, sir. Q. Just state in your own way what was done, what he said and did at that time? A. My mother's death came so suddenly that for weeks and days following he wasn't able to sleep or eat, until finally he said that his physician told him that the only rest he could get would be to take a European trip, which he did; and after he had been abroad about a month he

was able to sleep some and get some rest. Q. Well,
just state what he did and what he would say and do
during that time? A. Well, he would rave and say
he had nothing to live for, and that he didn't believe
in God, and that he wished he was dead. He would be
very excited; he would walk, and smoke, and
drink, and nothing gave him any rest, and he couldn't
sleep at all at night, not at all. Q. Well, did he show
his feelings in any other way? A. Well, he was great-
ly grieved; he cried pitifully. Q. How did he show
his grief? A. He cried constantly. He couldn't see
anything that belonged to my mother that he wasn't
reminded of her, and he would cry. Q. How long did
this condition of affairs last after your mother died?
A. I should say it lasted for at least three years. Q.
What statement would he make, if any, to indicate
his condition of mind? Just state what he said to
you and the other children? A. Oh, he would say life
was all over for him; he had nothing to live for; he
cared for nothing. And I always told him he had his
children, he had a great deal to be thankful for. But
he didn't think so; he felt my mother was taken, he
felt everything was taken away."

Witness further testified: He took more interest
in his children after his first wife's death, and was
more affectionate towards them than before; I had
letters constantly from him when abroad the first time;
I noticed a change in my father's mental condition,
he was more excitable at the time of my mother's
death. He was very restless, irritable, despondent,
unhappy, would get angry very quick, and the least
thing would provoke him; he drank a great deal more
than he ever had; my grandfather died on December
29, 1891. "Q. Will you describe your father's actions
on that occasion? A. He was very much overcome at
my grandfather's death, and drank a very great deal
that day and night, and he was just raving, nobody

could say anything or do anything to please him, and on my grandfather's death-bed he wished to change his will, he was afraid to leave the children.

"MR. RULE: What was said by both parties, both your father and grandfather? A. When my grandfather was dying he wished to change his will. Q. Just state what he said? A. He said he wanted to change his will."

"MR. REYNOLDS: Were you there at the time? A. Yes, sir. We were all there, my brother, my sister, my father and myself.

"MR. RULE: That was just six months after your mother died? A. My mother died in April and grandpa died in December; and grandpa said 'Ed, I want to change my will. I wish to make somebody else the executor besides you.' And he was dying when he said it, and in fifteen minutes afterwards he was dead. Q. What did your father say? A. Father said, 'Oh, Colonel, that is all right. Don't mind about that, I will take care of the children and your will.' Q. Did your grandfather give any reason why he wanted it changed? A. He said father was drunk so much he was afraid he wouldn't be able to execute it properly. Q. Said that to your father? A. To my father in our presence. It was almost his last words. Q. What was your father's nervous condition after the death of your grandfather? Go on and finish the incidents of the night of your grandfather's death. State what occurred there at the house. A. My grandfather died about one o'clock in the morning, and papa had been drinking very heavily all day and evening, and after his death he became so boisterous, and he quarreled and raved and fussed with everybody until I was so frightened I took my brother and sister and left the house and went to my own home on Thirty-third and Leonard avenue, and remained there until morning before I returned. Q. Well, what did your father

say? A. Oh, he swore at us all, and said there was no God, and nothing for him to live for. Q. Did you leave any one at the house with your father? A. Yes, sir; we left the trained nurse and servants and the undertakers. Q. Now, when you returned to the house the next morning did you have any conversation with your father about his actions of the night before? A. He had forgotten all about it. Q. Well, did you have a conversation then? A. Yes, sir; but I mean he didn't refer to the evening before. He was just as pleasant and subdued and quiet as he could be. Q. You referred to it? A. No, never said a word about it.''

Witness further testified as follows: My father lived at 3858 Washington avenue after my grandfather's death; he kept house for about a year after that; a cousin of ours came to live with him and take care of the children and the house; he was extremely unhappy, drank a good deal, was very restless and miserable; after moving off of Washington avenue he went to boarding, and lived at the Franklin Hotel; he married his second wife the 17th of January, 1899; I came to St. Louis for Christmas dinner at my father's house. He told us all that he was going to marry a young lady, his stenographer, that he was very lonely; that he wanted a companion; that it was not a love match; he simply wanted someone to take care of him and be a companion for him; he wanted to know if we objected, and I told him if it would bring him any happiness I was very glad to see him married, and we all said about the same thing. He married a Miss Kelly; following the marriage they boarded a little while. I took a trip to Europe with my father and his second wife in April, 1900; the voyage took eleven days; during that time they quarreled and fussed all the way over; to such an extent that everybody

208 Sup—24

heard it; my father used boisterous and profane language in the stateroom and out of it. I parted with them in Brussels. I returned to the United States in December, 1900. Then I lived in Philadelphia about a year and a half.

Drs. M. A. Bliss, Frank R. Fry and Henry Herman, upon the hypothetical question set out in appellant's abstract, said that they thought the subject of the hypothetical question was of unsound mind, that he had pre-senile dementia, accentuated and hastened by the use of alcohol; that the subject of the hypothesis had a weakened will and would be influenced in most any direction by a stronger will; would be most readily influenced by being lead, not by being driven, and influenced especially by those who contributed to his creature comforts. Drs. Bliss, Herman and Fry were all three experts of the highest standing.

Plaintiffs introduced some ten or twelve other witnesses who testified that they had known Captain Holton for years, and then stated the facts upon which they based their opinions, and then stated that in their judgment he was of unsound mind at the time he executed the will, November 10, 1902.

The hypothetical question propounded to said physicians covers some ten or twelve pages of printed matter and embraces substantially all the facts which plaintiffs' evidence tended to prove. It is omitted from this statement because of its great length and because it will serve no good purpose by setting it out in this statement.

Such additional facts as are necessary to be stated for the proper disposition of this case will be found in the opinion.

This was substantially all the evidence offered and introduced by plaintiffs, respondents here.

At the close of it, counsel for appellant asked the court to give these two instructions:

"1. The court instructs the jury to find that the instrument produced by the defendant, Lillian M. Holton, bearing date November 10, 1902, is the last will and testament of Edward K. Holton, deceased.

"2. The court instructs the jury that there is no substantial evidence in the case tending to show that defendant, Lillian M. Holton, exercised any undue influence over Edward K. Holton, her husband, in causing him to make the disposition of his property, as set out in the paper produced as his will. And as to this issue the jury will find for the defendants."

The court refused to give either of said instructions, to which refusal appellant duly excepted.

The defendant below, appellant here, Mrs. Lillian M. Cochran, designated throughout the trial as Mrs. Holton, introduced witnesses who testified to the following effect:

*S. S. Gould,* 58 years old, in the shovel manufacturing business for twenty-five years, and vice-president of and stockholder in the St. Louis Shovel Company. Had known Captain Holton since 1880, intimately associated with him in business, and socially, from 1886 to within two months before his death. Had met him frequently and continuously from 1886 until the 25th of September, 1902, which was the last time he had met him; met him then in St. Louis. Testified that there was no particular change noticeable in Captain Holton during all the period of his acquaintance, any further than incident to any man in the lapse of years. Considered him a very bright business man. Captain Holton was in active management of the business of the St. Louis Shovel Company until it went into the trust in 1901. No one in that company had more to do with the active management than he had. He was excitable at all times. Very demonstrative; gesticulated, talked violently, easily provoked to anger, very erect in his carriage, a fine dresser; was very

much humiliated by the fact that he was not retained
in the employment of the company when it went into
the trust; thought his associate, Julius C. Birge, was
responsible for that.    Witness was with Mr. C. A.
Thompson in August, 1902, when they met Captain
Holton at the Auditorium; was there with him two
days; saw no change in his personal appearance at that
time from what it had always been; he was not stoop-
ing; he was not emaciated; he had no peculiar look in
his eye, and the only trouble that he had was that he
was suffering from stomach trouble that had bothered
him for a number of years.    He conversed intelligent-
ly; was not intoxicated.    From his acquaintance with
Captain Holton and long association with him con-
sidered him a man of perfectly sound mind, and there
was no mental difference in him mentally the last time
he saw him, September 25, 1902, from what it had been
in all the years of his acquaintance with him.

*Dr. William Pennington*, practicing physician in
charge of the French Lick Springs Hotel, at French
Lick Springs, Indiana, met Captain Holton there in
June, 1902, and then again in October of the same year.
Knew Captain Holton professionally and socially; be-
came very intimate with him.    Captain Holton came
there to be treated and put himself under the charge of
witness.    Made a thorough examination of the Captain
physically on both occasions that he was there. Did not
have to treat him for alcoholism.    His trouble was with
his stomach; witness had examined him carefully
enough to say that he had no signs or symptoms of
pre-senile dementia.    First time witness met Captain
Holton in June, he was under his charge for five weeks;
the last time, in October, 1902, a little over two weeks.
Was a very striking looking man, erect, rather a mil-
itary bearing, very neat, scrupulously neat in his dress,
a very intelligent conversationalist, had traveled a
good deal, well informed about general matters; con-

sidered him a man of entirely sound mind. Told witness on one occasion, when witness had been speaking to him about his family, that he had but one son, and that he had placed in him his hope and faith for a future great man but his hope and faith had not been well founded; it had been blighted in that his son had been given up to reckless dissipation and shiftless investments and he did not amount to what he had hoped he would. Captain Holton was quick on his feet; looked well, had no shuffle in his walk, and from his observation of him considered him an exceptionally bright man, and that he was of sound mind. Did not express any dislike for his son when talking of him; only spoke of his disappointment in him.

*John 'W. Estes,* manager of Equitable Life Insurance Society for Missouri, before that traveling man for Meyer Brothers Drug Company; in that employment had traveled all over the United States for about fourteen years and came in contact with a great many men. Met Captain Holton in October, 1902, at French Licks Springs. Was there with him about two weeks, every day. He and Captain Holton left there and came to St. Louis together. Captain Holton in a conversation about his son stated that his son had not done very much good for himself, that he had given him a good deal of money; that they had had a disagreement; that his son did not advise with him any more and that they did not get along well together. He was with Captain Holton at French Lick Springs until the 27th or 28th of October, 1902, and about two weeks after, about the middle of November, 1902, met him in St. Louis. He had not changed any in appearance or manner from what he was when he saw him at the Springs. Looked as well or better than he did at the Springs, and witness had remarked so to him at the time. Captain Holton carried himself as any other man of his age. Was

very straight, did not shuffle, dressed very neatly, considered him a man of sound mind.

*Dr. Henry N. Chapman,* physician, in active practice in St. Louis, graduate of various medical schools, had been assistant to Dr. E. W. Saunders, member of the board of health of the city and on the visiting staff of the City Hospital. Acquainted with Captain Holton and Mrs. Holton for three or four years before the Captain's death. Met him at his house and at witness's office and on the street and at the houses of mutual friends. Had met him at least thirty times in the last three years. Last time he met him was about three weeks before he died, when he met him on the street and stopped and had quite a talk with him. The Captain was feeling very well at the time. Looked better than witness had ever seen him look, and witness remarked on that fact. Captain Holton was under witness's professional charge during the summer of 1902; he consulted witness, and he was under the care of witness professionally for treatment for catarrh of the head. Observed his physical and mental condition; saw no traces of neurasthenia nor of arterial sclerosis; examined Captain Holton to such an extent as to be able to state what his physical condition was, and stated it. There never was a stage of dementia of any kind, senile or infantile or any other kind present in Captain Holton. From his observation of him and association with him and examination of him, was of the opinion that his mental condition down to the last time witness saw him was perfectly sound. Captain Holton occasionally spoke of the fact that his children had treated him badly. Did not state the particulars.

*William R. Hodges* testified he was 64 years old, in the granite business in St. Louis; member of the city council; had known Captain Holton for thirty years. Knew him intimately for the last eighteen years of his life. Was one of the pall-bearers at his first wife's

funeral.  Met him very frequently.  Transacted business with him in 1891, when he made a contract with Captain Holton for the erection of a monument for the Captain's father-in-law, Mr. Birchard.  Had business with Captain Holton about a year before his death.  Had witness figure on a design for a monument which he wished to erect in Wisconsin, over his father and mother.  Witness made the sketch for him and gave him the figures.  Captain Holton afterwards came to him and told him he could get it done cheaper at Milwaukee, using the design witness had made for him, and for which he insisted on paying witness.  Had great many conversations with him on all sorts of matters.  Captain Holton called on him immediately after his return from Europe, in 1902.  Asked about what Captain Holton's manner was in conversation, he said, "Well, I will say this, in some respects Captain Holton was an exception to the ordinary run of men; he was a man of very intense feeling; he was a very intense man.  In making an ordinary statement he would state it with a positiveness and intensity much greater than the ordinary man would make such a statement.  He was a very demonstrative man, and if you had a conversation with him and he disagreed with you, for a person who was not intimately acquainted with him and familiar with his mental characteristics, you might conclude that he was very angry with you, but it was simply his emphatic and intense manner, which seemed to be natural with him.  He was a man given to gesticulation; would swing his arms and his hands.  He was very erect.''  The last time witness saw him was within a week of his death, in witness's office; had a conversation with him.  Saw no change in Captain Holton's personal appearance and observed none in his manner or mental tone different from what it had been in all the years of his acquaintance with him, except that he showed the changes natural to man whom you had

known thirty years. He had grown more stout; was rather more excitable; his natural intensity was somewhat more pronounced than when he was a young man, but there was no mental change noticeable in him. The last time he saw him, which was within a week of his death, his mind was as sound, in the opinion of witness, as it had been at any time throughout the thirty years of their acquaintance. Considered him a man of sound mind. He spoke sometimes of his relations with his family; had seemed troubled and disappointed that his relations with his children were not what he thought they should be. Understood this was something over the distribution of stock and of some estate that the Captain had had in his charge, but did not learn this from Captain Holton. On cross-examination witness was asked this question by counsel for respondents: "Now, Captain, you, possibly, more than any other man, would notice him with that degree of care that would enable you to fix whether between the times in the conversation about his drinking and the time you met him in October or November, 1902, there had been any change in his physical appearance?" Witness answered, that he did not notice any special change. Had not noticed any in the last years of Captain Holton's life, no more than among witness's friends generally of that age. When a man gets along about 58, 59, or 60, there are sometimes physical changes that take place very rapidly. Asked whether they had taken place in Captain Holton, witness said, not especially so that he remembered.

*John J. Cantwell* testified he had been in the shovel business since 1839; knew Captain Holton in his lifetime, had known him for from thirty to thirty-five years; transacted a great deal of business with him, and that continued down to 1898, when witness went out of that line of business. Met Captain Holton very frequently after that; had many conversations with

him.   Met him after Captain Holton's return from
French Lick Springs in October, 1902, and he told him
the trip there had done him a great deal of good.   Wit-
ness said he looked better at that time than he had pre-
viously.   He was dressed in his usual way, was a good
dresser, carried himself erect, saw him about four days
before he died.   Had thought he looked better than for
sometime before.   Conversed in their usual manner. In
an ordinary conversation Captain Holton was assertive
in his manner.   Was a first class business man.   Wit-
ness noticed no change in Captain Holton's demeanor
or mental characteristics in the last few months of his
life from what it had previously been.   Within the past
two years Captain Holton spoke of his children having
given him a good deal of trouble.   That was all there
was to that.   Did not say what it was about.   Captain
Holton had not changed any in his conduct or habits
in the last years of his life; had always been a drink-
ing man; was loquacious and talkative.   In witness's.
opinion he was a man of sound mind.   On the occasion
of meeting him three or four days before he committed
suicide, their conversation lasted about five minutes.
Was on the usual ordinary subjects between old friends
when they met.   Spoke to the Captain of his looking
well.   He was as sane a man, witness said, the last day
he saw him as he was the day he first met him, in his
opinion.   Had never given a thought to the question
of his sanity; had no occasion to discuss it; always
supposed he was sane; thought so all the time he knew
him and thinks so now.

   *David G. Evans,* sixty-three years old, had lived in
St. Louis since 1866; had known Captain Holton nearly
forty years ago.   They were boys together in Wiscon-
sin and came to St. Louis within a few months of each
other.   His acquaintance with Captain Holton was en-
tirely social and personal.   Met him two or three times
a week between the time of his return from French Lick

Springs in October, 1902, and the day of his death. Conversations with him would last sometimes a half hour, sometimes ten minutes, sometimes two or three hours. Had seen Captain Holton oftener after he was out of business than before. He always had a peculiarity of talking in a loud tone of voice. Was very demonstrative, given to gesticulation. "He was positively of a positive character." Drank occasionally. In the past ten years witness said he had met him "very, very many times." Could not possibly say how many times or when or where. They were both in Europe in 1902 and got back sometime in July and after that they had met very frequently. From his acquaintance with him through all these years, had no doubt of his soundness of mind; considered him a man of sound mind. In conversations the question of their children would come up sometimes and Captain Holton complained that his children had not been as dutiful and filial as they might have been, and that he was disappointed in them. Witness thought they had an effect on Captain Holton's feelings but did not think it had any effect on his mind. He would show his feelings sometimes about the matter by tears coming to his eyes. He was a very responsive sort of a man anyhow, and his feelings easily affected, and in speaking of his troubles he seemed to be affected by his own recitation of them. Holton had never spoken to witness as to the details of the trouble with his children, but knew that it had something to do with the distribution of the stock in the Ames Shovel and Tool Company. He said Captain Holton was a "moody" man, not in the sense that a man gets gloomy and blue, but in the sense that he was a responsive sort of a man, and changed rapidly from one mood to another. Always did. He would get despondent and was easily cheered up. Would be in a notion to do one thing to-day and something else to-morrow. Was a man of fine appearance, erect in his

carriage, neat dresser, given to violent gesticulation, threw his arms around and very positive and domineering.

*James O. Churchill,* sixty years of age, Special Deputy United States Surveyor of Customs, formerly Collector of Customs, been a clerk of the United States Court and United States Commissioner. Had known Captain Holton for 15 years. Met him frequently, possibly every Saturday afternoon, for a number of years past. Had many discussions with him over current events, different matters, the tariff question and such things as men usually talk about. Had played cards with him. Captain Holton's manner was very positive. He was given much to gesticulation. Vehement in his talk; he was very erect in his carriage, neat in his dress and of rather commanding figure. Met him about a week or ten days before his death. Did not notice any change in him then from what it had always been; considered him a man of sound mind.

*Ford Smith,* sixty-two years of age and a lawyer; lived within sixty feet, two doors, of Captain Holton; in the last two years of Captain Holton's life had seen him from eight to twelve times a week. Conversed with him on all sorts of matters; rode up and down town with him in the street cars, which was a ride of about thirty minutes. He talked in a very intelligent manner and expressed himself very intelligently. Considered him a man of sound mind.

*John H. Heimbucher,* testified he was sixty-two years old, engaged in business in St. Louis since 1881; is in the iron and steel business. Acquainted with Captain Holton since early in the 70's. First met him in Pittsburg, when Captain Holton came to see him in connection with some business matters; knew Captain Holton intimately and did business with him after he came to St. Louis in the fall of 1881 down to the time that Holton ceased to be actively engaged in business,

in 1901, when his company sold out to the trust. Had not noticed any change in Captain Holton's mental acumen in that period. Saw Captain Holton after he went out of business frequently. The last time was a week or ten days before his death. Saw him in the summer of 1902, when he came back from Europe or in the fall of that year. Captain Holton gave him an account of his trip abroad. They went into a saloon, took a drink together, stood there and had quite a long conversation. Captain Holton complained of having nothing to do and that he was tired of loafing around and would like to get at something. Said he had sold out at the wrong time. He was not excited; talked very rationally and very intelligently and he conversed as rationally and in the same manner as any other man would. The conversation lasted about a half hour; talked as rationally as he ever did in the whole course of their business and social acquaintance. Talked about the condition of the iron market. Saw no change in his mental character in the later years of his life. Considered him a man of sound mind.

*F. B. Northrop.* In the oil business; acquainted with Captain Holton for ten or twelve years. Boarded at the same hotel with him for a month or two. Sold him oils for use in his company. Captain Holton did the buying and contracting for his company. He was a very shrewd dealer and witness dealt with him until 1895. After that kept up his acquaintance and met him frequently. Last time he saw witness to have any conversation with him was a week or ten days before he died. Conversed on business matters, current events. Through the years 1901-1902 had many conversations with him. He was a quick talker, a very proud, dignified man, very well in his personal appearance, always very neat, always walked very straight, in military style. Witness had not noticed any change in the mode and manner of his conversation and the trend of his

mind or any diminution of his mental power in the ten years of his acquaintance with him and was satisfied that during all the time he knew him and down to the last time he saw him he was a man of sound mind.

*August Gehner.* Title investigator, dealer in real estate, connected with the Gehner Realty & Investment Company, German American Bank, and a number of other institutions. Is 57 years old; had lived in St. Louis since 1859. Had known Captain Holton seven or eight years before his death. Met him outside of St. Louis at French Lick Springs, Indiana, in July 1902, where witness was for about four days and spent about three hours a day with him there. Had known him in St. Louis before then and had transacted business for him in connection with a real estate deal. Witness had his son with him at French Lick Springs on that occasion, and Captain Holton remarked that he was sorry that he could not travel with his children, but that he had some dispute with them. Captain Holton said he would like to go back into business or use his means in active business. He conversed like any business man would. Witness walked around with him those three or four days, three or four hours a day, and they talked about all sorts of matters. After returning from French Lick Springs he had met Captain Holton possibly a dozen times or so in St. Louis on the street, at the St. Louis Club and other places; played pool with him; had conversations with him about a week prior to his death. Had also met Captain Holton at Mackinac in the summer of 1902; they were at the same hotel; met him daily sitting on the veranda, chatted and talked with him. They were there together about a week in August; had many conversations with him on that occasion; talked about business investments, old war times, current events. Captain Holton talked like any sensible busi-

ness man would do.    In his opinion Captain Holton was a man of sound mind.    He was always gentlemanly, very neatly dressed, very pleasant, carried himself very erect; saw no change in his conduct in the past weeks of his acquaintance from what it had always been. On cross-examination, said he saw him about a week before he committed suicide.

*George W. Taylor* testified:    Am thirty-four years old; in the life insurance business in St. Louis; the nature of his business caused him to observe people very closely.    Met Captain Holton in French Lick Springs in June, 1902.    Was there with him about ten days; had many conversations with him, mostly about the Captain's travels, places he had been to, people he had met, countries he had visited.    They walked around together a good deal there; Captain Holton carried himself in a military manner.    Very neat in his dress, very emphatic in his conversation, a man of very fixed opinions.    Met him in St. Louis after that a few days before his death.    He looked then much as he did in French Lick Springs.    In his opinion he was a man of sound mind.

*Lloyd G. Harris* testified:    Am sixty-three years of age, in the manufacture of handles for tools and shovels, dealt in lumber, lived in St. Louis since 1874. Became acquainted with Captain Holton forty years ago, when they were playmates together in Milwaukee. They both went into the army and were in the same company for a while; met during their army service. Did not meet after that until witness came to St. Louis and started in the manufacture of hickory handles and wagon woodwork.    Witness's company had business transactions with Holton's company, commencing in 1874.    Transacted the business with Captain Holton; he was a very shrewd business man, a very positive man, very intelligent and very quick.    After their business association ended, they were thrown into

close contact socially.    For the past fifteen or sixteen years have met very frequently.    At least a dozen times a year; had been with him for probably an hour at a time at each meeting.    They discussed politics, general business, tariff questions, whatever was current news, and their home life.    On these occasions Captain Holton conversed as he had during all their long and intimate acquaintance.    He was very demonstrative; used gestures, sometimes almost too vehement when in the heat of argument.    Noticed no change in his mental characteristics in the last two years of his life from what it had been for ten years, except that after going out of business he was not satisfied with the situation and wanted active occupation and so expressed himself.    He was always well dressed, retained his military training and walked erect. Considered him a man of sound mind.    No marked change in his general appearance the last time witness saw him from what it had been right along.    The last time he saw him was ten days or a little less before his death.    Saw him a week before that.    Was willing to take his solemn oath, he said, on cross-examination, that he had seen him at least a dozen times inside of six weeks before his death and that that was no mere impression on his mind.

*Otto H. Witte,* fifty-seven years old, hardware merchant.    Had known Captain Holton about thirty years. Bought shovels, spades and everything of the kind that the St. Louis Shovel Company could make; always bought from Holton.    He was the general manager of that company.    His dealings with Captain Holton were large and lasted twenty-five or thirty years and continued down to the time Holton left the business in 1901.    Witness seldom came in contact with anyone else in that concern except Holton.    Saw no change in his business character in all the years that he knew him down to the time he quit in 1901.    He

Holton v. Cochran.

was a very demonstrative man, but pleasant to do business with.    Gesticulated when he talked.    Had met him about a week before his death; did not notice any change in him then from what he had been before. He came to see witness in his office and had a short conversation with him about three or four days before. his death.    Also had quite a conversation with him about a month before that.    In the months prior to his death had seen him once in about two weeks. Before he went out of business saw him every few days.    When he met him conversation would last an hour or two.    Talked about market and change in business, etc., and in opinion of witness he was a man of sound mind.

*William B. Dean,* seventy years of age, in the grain business in St. Louis; had lived here since 1865; became acquainted with Captain Holton twenty-five or thirty years ago; his acquaintance was social, friendly and a family acquaintance.    Last time he saw Captain Holton was in St. Louis in August, 1902. Met him frequently before that; met him in French Lick Springs in July, 1902.    Was there with him about ten days—with him every day while there.    Had conversations with him in regard to his trip to Europe; discussed the waters he had been drinking when on his trip to Europe.    Had some talk about his children.    Said his daughter had married a man who had treated her badly, and that he had aided her to get a divorce.    Said something about his son, conveying the idea that his son's conduct was not entirely satisfactory to him; did not speak about his daughter Alice.    Said he regretted having gone out of business when he did; needed active employment. He was a very emotional man, talkative, carried himself erect, a good dresser.    Noticed no change in his mental condition the last time he saw him from what

it had been during all the years of their acquaintance. Considered him a man of sound mind.

*Otto Weik* testified.    Was acquainted with Captain Holton; met him in French Lick Springs the 14th day of June, 1902.    Had known Mrs. Holton before her marriage, and Mrs. Holton introduced him to the Captain.    They discussed business, had conversations on many subjects.    Afterwards met him at his home in St. Louis; the last time within a week before his death.    Considered him of sound mind.    Was a good dresser, sprightly man for his age, carried himself very erect, looked much younger than his years.    The last time he met him, he said, on cross-examination, witness asked him why he should go into business when he had plenty of money to live on.    Captain Holton said yes, but that wasn't it, and he said that his children had caused him lots of trouble; did not say in what way, nor discuss it.

*Edward Remington* testified, is the manager for W. L. Douglas shoe concern in St. Louis.    Lived here since 1889.    Had known Captain Holton for five years previous to his death.    Got acquainted with him through his acquaintance with Mrs. Kelley, whose daughter was Captain Holton's second wife.    Witness had boarded with Mrs. Kelley.    After the marriage of Captain Holton and Miss Kelley, witness visited him frequently, while Captain Holton was alive, as much as once or twice a week.    Usually took Sunday dinner there.    Knew the family very well.    His acquaintance with Captain Holton was entirely social. Spent evenings there and had many  conversations. Was there with other guests and Captain Holton conducted himself in a gentlemanly manner.    Sometimes he was drinking and very rough in his manner, again when he was sober he was not rough.    Can't say he ever saw him drinking to excess.    When drinking

208 Sup—25

he was domineering and a little abusive. Was a great talker. Often discussed business with him. When Captain Holton was in town he often dropped in to witness's place of business. Last time witness saw him was on the Sunday afternoon before he died. He died the following Tuesday. Was there the Friday evening before that. Talked longer with him that Sunday evening than usual and played cards. Captain Holton complained that evening of being sick. Was not under the influence of liquor. Talked as he had always talked. Witness met him many times in the last two years of Captain Holton's life. Seldom missed a week. Knew all of Captain Holton's children. Only time Birch Holton had ever spoken to witness about his father was one day when he came to witness's store and told witness he would probably never see him at the house any more. Said he expected to have a lawsuit with his father if his father did not settle with him, and he expected, if he had a lawsuit with him, he would not be at the house any more. That was in 1901 and a short time after Birchard Holton had returned from the North where he had been for a short time. That was before Birch had married. On that occasion Birchard told witness that he wanted some sort of a settlement with his father and he told witness something about it, but he did not remember the details. Had heard Captain Holton talking about the settlement he had made with his children after it was made and Captain Holton gave him the impression that he was humiliated by the manner in which his children had compelled the settlement. Considered Captain Holton a man of sound mind. Noticed no material change in his appearance and manner of carrying himself in the last week of his acquaintance from what it had been when he first met him and the same with regard to his mental char-

acter and manner of conversation.    Captain Holton's
walk was like that of a man young in years.

*Dr. Wm. Conrad* testified that he was a practic-
ing dentist; had been practicing his profession in St.
Louis for twenty-six years.    Had known Captain Hol-
ton since 1893, since which time he had attended to
Captain Holton's teeth.    Captain Holton had been in
his dental rooms many times from that time until a
short time before his death; about five weeks prior to
his death.    Witness had had many opportunities of
observing him while he was under his treatment.    He
was under his treatment possibly every four to six
months, and from four to six weeks at a time.    If
there had been anything peculiar about him witness
could not have failed to observe it, as he was obliged
to observe his patients carefully.    There was noth-
ing in Captain Holton's appearance or demeanor out
of the ordinary to attract attention.    Witness had
had many conversations with him during this period
on a great variety of matters, and on the subject of
the treatment of his teeth and the symptoms he had.
Considered him a man of sound mind.    On cross-ex-
amination Dr. Conrad was asked if he thought that a
man who complained to a dentist of how a tooth aches,
must necessarily be of sound mind, and Dr. Conrad
said, not necessarily so, but he would say that insane
people don't ever complain of their teeth.    He knew
that from his experience of from fifteen to twenty
insane patients during his practice of twenty-six
years.

*Miss Grace Grupe,* assistant to Dr. Conrad, dur-
ing the period stated, had known Captain Holton since
1891; was a very punctual man; had seen him a great
many times in the office; had conversations with him
such as she ordinarily had with their patients, and saw
nothing unusual in his appearance to attract atten-
tion.    The last time she had seen him was the 11th

of November, 1902.    She thought he was of sound mind.

*Hon. Horatio D. Wood* testified that he is one of the judges of the St. Louis Circuit Court; had been acquainted with Captain Edward K. Holton for the last fifteen or sixteen years of his life.    Had met him and had very many conversations with him during these sixteen years.    Conversation on social matters and matters of current news and general subjects that men would converse about.    Holton always carried on these conversations in an intelligent manner, the same as any one else.    The last time witness saw him was some time between the end of September and the first of December, 1902; had noticed no change in Captain Holton's mental character in the latter years of his life.    Had seen him in meeting at their army society every month.    There was no meeting at which they did not have some conversation on some subject or other; that had been the case for the past fifteen years, down to the date of his death.    When counsel for appellant asked Judge Wood if he had an opinion as to the soundness or unsoundness of mind of Captain Holton, counsel for respondent asked leave to cross-examine Judge Wood upon his opportunities to see and observe the conduct of the testator, before he expressed an opinion.    The court gave respondents' counsel that opportunity.    Asked at the conclusion of this cross-examination if he had an opinion and could give it based on his intercourse as to the soundness or unsoundness of mind of Captain Holton, Judge Wood anwered that he had such opinion and that in his opinion he was a man who was perfectly sound in mind.

Appellant read in evidence the deposition of *Dr. A. Paggi,* who testified that he was forty-nine years old, practicing physician, resides in Florence, Italy; received his education at different institutions he named; been in active practice since 1879. Knew Captain

Holton while he was traveling in Italy in 1902.  Met
him in Florence, Italy, in the spring of that year at
a hotel.  Prescribed for him, treated him for kidney
trouble from which he was suffering; he was under
witness's care two weeks.  He saw him six or seven
times; became well enough acquainted with him to en-
able him to form an opinion as to his mental condi-
tion.  He saw no signs of insanity, but as he indulged
in spirits he may have been sometimes out of his mind,
though witness had not seen him in that condition.  In
answer to cross-interrogatories, witness said that he
would spend half an hour, sometimes longer, with Cap-
tain Holton on each visit.  Captain Holton's wife
was with him.  Captain Holton complained of weak-
ness, of dyspepsia, he had enlarged liver, albumen pres-
ent in his stomach.  Witness said he had made a diag-
nosis of Captain Holton's case as to his physical con-
dition.  Made none for mental, as there was no need
to do so.  He showed signs of dissipation.  On re-
direct interrogatories, witness deposed that from his
observation of him thought Captain Holton used stim-
ulants, but not so far as to affect his mind.  Stated
that in his opinion Captain Holton was capable of
transacting his own business.  This part of the an-
swer, on motion of respondents, was stricken out by
the trial court, and appellant duly excepted.

*John R. Cook,* witness for appellant, testified that
he is assistant cashier of the Third National Bank of
St. Louis, has been such for the past ten years.  Was
in the banking business thirty years; knew Captain
Holton; he was a depositor in the bank, transacted
business with him in that connection, but his business
was more frequently with the tellers.  Last business
witness transacted with Captain Holton was on the
11th day of November, 1902, when he came to the bank
and got a letter of credit.  Was about to go to Europe
or Japan and wanted a letter of credit whereby he

could get money while traveling. The bank officers fixed up the letter of credit so that he would be able to get his money wherever he went. He transacted that piece of business in a perfectly correct manner. Wanted a letter of credit to the extent of $3,000. Stated what he wanted; witness had the bookkeeper draw identification paper and after it was drawn up witness took it to Captain Holton to sign. It was for identification and to be forwarded to their European correspondents. Then gave Holton the letter. Captain Holton also signed another letter to cover payment of his drafts drawn against his letters. Witness produced the papers spoken of and they were read in evidence. Witness further testified that on the 12th of November, Captain Holton got the $3,000 worth of credit, and his identification signature was attached to a separate book. Captain Holton also signed a letter guaranteeing Kuntz Brothers on these letters of credit, and at the same time he left with witness a certificate for 100 shares of Ames Shovel and Tool Company preferred stock. A receipt was given to Captain Holton for that. Receipt here read in evidence. That was the last time witness saw Captain Holton. The understanding arrived at with Captain Holton that day was, that, as he always kept a good balance with the bank, the balance should be kept up by deposits made while he was away. In case the balance should get below any draft which he would draw against these letters, then, if the bank desired, it could hold these one hundred shares of stock as collateral. He always kept a good balance with the bank. In writing out these letters of credit, Captain Holton made some suggestions about changes in them, and the changes were made as suggested. According to witness's recollection, the receipt as originally presented to Captain Holton stopped with the words, "To be used as collateral if desired," and at Captain

Holton's suggestion the witness added the words, "When all credits are satisfied, certificate to be returned to him, subject to his order or inspection." The last sentence Captain Holton put in, and after that was done he signed two books crediting Kuntz Brothers' letters. The date of the transaction was the 12th of November, and the date in the receipt of the 13th of November, witness said, was a clerical error. Witness considered Captain Holton perfectly sound in mind. His conduct in the transaction and attending to the business was perfectly natural. His conversation about the matter entirely correct. Witness thought when he transacted the business with Captain Holton he was perfectly sound, and he is still of that opinion. On cross-examination witness said that he saw no one else there than Captain Holton. Business was transacted entirely with him. Did not have two transactions with Captain Holton, one on the 12th and one on the 13th. Accounts for the receipt being dated on the 13th as purely a clerical mistake; mistake could not be in the letters of credit. The bookkeeper prepared them and brought them up to where he and Holton were, and Captain Holton signed them right off. He made application for the letters of credit on the same day they were issued, and it was all done on the same day. Knows the letters of credit were drawn on the day they were dated; it would not be possible that they were prepared the day before, and the day they were drawn was the 12th of November, 1902. On redirect examination witness said that no one directed or guided Captain Holton or prompted him on the occasion of his getting these letters of credit and having this transaction. This was the last transaction witness had with Captain Holton. He had been a customer of the bank for a long time. Letters of identification and receipt offered in evidence.

*George W. Galbreath,* cashier of the Third National Bank, testified on behalf of appellant that he remembered Captain Holton being in the bank and getting the letters of credit about the 12th of November, 1902. He came to witness to get the letters and witness turned him over to Mr. Cook, the assistant cashier.

*Mr. Henry Weaver,* witness for appellant, testified that he is in the hotel business. Runs the Planters' Hotel in St. Louis, also runs the Grand Hotel at Mackinac. Was proprietor of that hotel during the season of 1902. Been in the hotel business since he was twelve years old. Remembers meeting Captain Holton at the Grand at Mackinac in the summer of 1902. His conduct at the hotel was all right. Did not notice any peculiarity in him other than in any other guests. He was there some time; can't say how many times he met him. His wife was there with him. Often had conversations with him on everything in general; had known him in St. Louis and was glad to meet him at the Island. There was nothing peculiar about his conversation. They conversed about politics, and about boats, golf and riding around. Witness was there when Captain Holton left and settled his bill. Had met him in St. Louis a number of times since he returned from Mackinac. Did not talk with him as long as he had up in Mackinac. Up there they talked half an hour at a time. There was nothing out of the way in his appearance, he always dressed tidy; his deportment was good, he walked upright, and got around as well as witness did. There was nothing strange or peculiar in his action, and witness considered him of sound mind. On cross-examination he said Captain Holton might have been sick in the hotel at Mackinac before Mrs. Holton came there, but as a rule he, witness, would hear of such things, because a report is made in case of sickness, and he had

not heard of any such thing occurring in connection with Captain Holton.

*Dr. Oman Duesmenil* testified in behalf of appellant, that he is forty-seven years old, practicing physician in St. Louis for twenty-six years. A college graduate; specialist of skin diseases; has had a general medical practice. Knew Captain Holton during the latter part of 1901, and the last time he saw him was December 9, 1901. He was under his treatment for a skin disease and inflammatory trouble of the face, produced by trouble of the stomach; intestinal troubles and alcoholic stimulants. Treated him for it. He came to witness's office every fortnight for a year and a half; saw him about thirty times. In that period he was rather lively in his conduct and witness noticed nothing strange or different in his conduct than in other patients. Had no other business transactions than that; he paid cash every time he came.

*Charles A. Thompson,* recalled for appellant, testified that he had known Captain Holton about eighteen years, and his relations with him were very close in business, as well as socially; exchanged opinions freely, and relations were intimate. First knew Captain Holton when he was connected with the St. Louis Shovel Company, and witness was with Mr. Andrew Warren. All his business with the old company was carried on through Captain Holton until the formation of the trust in 1901. The social relations began in 1892 and naturally resulted from the business relations. Purchased large amount of goods from the Shovel Company, and all through Captain Holton. There was no change or difference in Captain Holton's conduct in business matters from 1885, when they commenced, after 1891, when his wife died, or down to 1901, when he went out of business. On the 10th of November, 1902, Captain Holton was in his office by

appointment to sign a bond for witness. He certainly was not under the influence of liquor on that occasion —was not intoxicated—and he was in witness's office possibly an hour and a half. After he got out of the Shovel Trust, Captain Holton rather used his office as headquarters. The last time witness saw him was on the 12th of November, 1902, when he came to witness's office and spent two or three hours with him; conversed about current topics, politics, the market and subjects that gentlemen usually discuss under those occasions. The first time Holton mentioned anything about his family troubles was the time his daughter, Mrs. Burrow, had some trouble with her first husband; only talked with him once about his daughter Alice, and, in that, he displayed some feeling over the fact that she had threatened to sue him in regard to some settlement. That was in the latter part of 1901, after the merger of the St. Louis Shovel Company into the trust. He expressed himself on several occasions as dissatisfied with the manner in which his son, Birchard, had been handling his patrimony. Said he was a d—d fool; that he was disappointed in Birch disregarding his advice in his business propositions; that he would have no money; would lose it all; not capable of taking care of it. Met Captain Holton in August, 1902, at the Auditorium Annex, in Chicago; was with him about three hours the day he left by boat for Mackinac; went to the boat with him. Mr. S. S. Gould was there with them. Saw Birchard Holton and his wife there on that occasion. Saw Captain Holton join them, and he stayed with them not over fifteen minutes, and then came back into the cafe and joined Gould and witness, and was with them all that afternoon, and the three of them went to the ' oat. On that occasion Captain Holton's appearance was perfectly normal. He walked as erect and as firmly as if he was on dress parade. He always talked very loud;

have been with him in cafes, and he gave his orders in a loud tone of voice, and in a very peremptory way. If things were to his satisfaction he said so, and if they were not he would express his dissatisfaction in a loud tone of voice. He often had quarrels with the waiters; often ordered things not on the bill of fare. Met Captain Holton and his wife in New York in 1901, at the time of the consolidation of the shovel concerns, and Captain Holton told him that the matter was practically settled. Captain Holton was in his normal condition on that occasion, in possession of all his faculties, and, from witness's acquaintance with him, was of opinion that he was a man of sound mind. On cross-examination, witness said that what Captain Holton said about his daughter Alice was that she had threatened, or was going, to take her affairs out of his hands, and put them in a lawyer's hands— going to sue him. Witness did not know what it was about. That was in November, 1901. When he spoke of Captain Holton's erect carriage and his dress-parade he referred to the whole period of his acquaintance with him; whether his health was good or not, his manner was always just the same; always buttoned up his coat; stood up straight and erect. In the latter years of his life, Captain Holton told him he was in ill health a great deal, but his appearance did not indicate it. From his appearance and acquaintance with him, he judged him to be fifty-eight or sixty years old. When Captain Holton dictated the present will in question in witness's office, on the 10th of November, 1902, he dictated it from a previous will which Mr. Zumbalen, the attorney, had written. Captain Holton took the old will out of his pocket. There was no memorandum whatever on it, and he made none, but just opened it up and went on reading in dictating. He did not say anything to his wife about it, nor she to him.

*Mrs. Anna M. Kelley,* witness for appellant, testified that she was the mother of Mrs. Holton, the defendant. On the day Captain Holton killed himself, he went down town about half past one and came back about four. Had been drinking. His wife discovered he had a pistol with him and tried to get him to give it up. He would not give it up, and went upstairs and they heard two shots in the room. Captain Holton drank often, mostly before meals, and always had liquor in the house, and, when they had visitors, he drank with them. On cross-examination, she said that she thought that, at times, he drank to excess. He often cried, or shed tears, when he talked of the trouble between Mrs. Bright and Birch and himself. His complaint against Alice and Birch was that he said they humiliated him in the East by sending on to the East to have a settlement of some kind made. This was about the stock in the Ames Shovel & Tool Company. He said they had humiliated him in the matter, and had branded him a thief with the Eastern people; that they would not allow the Eastern people to send the papers to him, but insisted on having them sent direct to them. That was what she meant by saying that they had humiliated him sending East "to get a settlement." Did not hear the discussion between them when the settlment was made in November, 1901. The first she noticed of his grieving about the treatment of him by his children was in the fall of 1901, and he grieved over that down to the time of his death. Towards the latter time he did not talk about it as much as he had at first. He heard Captain Holton tell his son, Birch, that if he forced this settlement on him, he would cut him off in his will. That was about the settlement of the stock. He got angry very easily.

*Joseph H. Zumbalen* testified on behalf of appellant. Is an attorney at law and practicing in St. Louis

for seventeen years; is forty-three years of age; asso-
ciated in. practice with Mr. Clinton Rowell, formerly
Rowell & Ferris; before that with Fisher & Rowell,
then with Mr. Clinton Rowell.     Knew Captain Hol-
ton in his lifetime.     Never met the present Mrs. Hol-
ton.     Had known Captain Holton since 1890; was a
client of their firm, and witness personally attended to
business for him from 1890 down.     The settlement
of Col. Birchard's estate by Holton as executor was
conducted under witness's direction as a lawyer. Drew
up the contract between Captain Holton and his daugh-
ter Alice, of date January 2, 1894.     During the fall
of 1901 that contract came under discussion between
Captain Holton and witness.     As the Shovel Com-
pany had passed into the control of the Ames Shovel
& Tool Company, the question arose as to the distri-
bution of the trust stock received for the Shovel Com-
pany stock.  ·  Captain Holton did not ask the advice
of witness about the matter or what settlement he
should make with his children.     He simply told him
about it, and that he had made it, and witness said
he had a very indistinct recollection of it.     What Cap-
tain Holton told him about this stock controversy was
preliminary to another matter.     They discussed this
contract, but not the construction of it; simply the
validity of it.     He told witness that his daughter
Alice said that, unless they agreed upon the distribu-
tion of that stock, she would claim all the dividends
that had been collected on it by him under this con-
tract, and Captain Holton asked witness whether she
could do that, and whether the contract was valid or
invalid.     Witness says that he told  him   that   he
thought it was a valid contract, and told him why he
thought it was valid.     Captain Holton seemed to think
that Alice and Birch were claiming a larger number
of shares than they were entitled to of the Ames stock,
and a larger number than he thought he was bound to

give them; but, as to the precise details of that, and the number of shares, and exactly what the controversy hinged on, witness said he could not tell. Captain Holton gave as his reason for not thinking that Alice and Birch were entitled to the increased number of shares that he had paid them a large rate of interest on their stock, and had taken all the chances of getting anything out of the Shovel Company stock in return, and he considered that the ultimate success of the shovel business was largely dependent upon his own personal efforts with the Shovel Company, and he looked upon it, in a large measure, as the result of his own labor.    After that Captain Holton came to witness about the 12th of November, 1901, and told him he wanted him to draw up his will for him. Holton brought with him a written memorandum of how he wanted his will drawn, which witness produced, and it was read in evidence.    Witness read it first before the jury as it came to his hands from Captain Holton, and then real the interlineations in the memorandum which he said Captain Holton gave him; these interlineations were in witness's own handwriting. In the memorandum as handed to witness by Captain Holton, this is stated:    ''I give and bequeath to my son, Birchard R. E. Holton, one dollar; to my daughter, Alice M. Bright, one dollar.    The reason of the small bequest is that, during my life, I have earned and paid to them $20,000 each on an inheritance bequeathed by their grandfather, based on $5,000 each, making in all $25,000 each, and I feel that I have fully done my duty as a father in providing this amount.''    Then, after making other bequests, he provided for giving the balance of his estate to his wife.    There was no signature to this memorandum.    The witness then stated what suggestions he had made to Captain Holton about drawing the will, and he states that it was on his suggestion that the reasons for making

the bequest or the legacy of $1 to Birchard and to
Alice were left out of the will.   Witness then produced
and read his office copy of the will which he had drawn
up for Captain Holton on that occasion, and the orig-
inal of which was signed by Holton in his office, and
witnessed by Mr. Joseph Laurie and Mr. John H.
Douglas, Jr.   Holton had left the memorandum with
Mr. Zumbalen on the 12th of November and came back
on the 16th of November; witness gave him the will
he had drafted; Captain Holton executed it and took
it away with him.   No one was with him at the time
he brought this memorandum and when they discussed
the matter of the will, and agreed on the changes.
Captain Holton said that the reasons for cutting off
Alice and Birch were those previously stated, and he
finally acceded to the judgment of witness that it was
best to leave that out, and also to leave out of the will,
as it was drawn, the suggestion contained in the memo-
randum about a trust in favor of Mrs. Garnett's (now
Mrs. Burrow's) daughter and about some insurance
matters.   After witness handed the will to Captain
Holton, on the 16th of November, he read it over and
said it was just as he wanted it.   The next time wit-
ness met Captain Holton was the 25th of November,
1901.   On that occasion he transferred a number of
shares of stock to his wife, and had witness attest his
signature.   Witness identified these certificates, from
which it appeared that this assignment to Mrs. Hol-
ton had subsequently been erased, and these certifi-
cates were part of those that came into Captain Hol-
ton's estate.   Witness saw him afterwards, so far as
he has a distinct recollection as to time, after Captain
Holton returned from Europe in 1902.   Remembers
distinctly seeing him on the 26th of November, 1902.
Had seen him earlier in the fall, but did not recol-
lect anything particular taking place between them.
On the 26th of November, 1902, he came to witness's

office to acknowledge an assignment of the life insurance policy to his son Birchard. Stayed there about half an hour. Talked about his trip abroad; said he was out of business, and it was difficult to dispose of his time. Seemed quite unhappy and discontented; so much so that he finally broke down and commenced to cry; said he was like a fish out of water; had been accustomed to working hard all his life; but he can't even go to see his friends now, because they were all busy and he didn't like to interrupt them. There was no change in his manner of conversation. Noticed no change whatever in his habit of mind. He was always very nervous and excitable, and rarely quiet for five minutes at a time. Had been that way ever since witness knew him. He was always ready to argue for his convictions, and to assert them, and hung on to them unless you showed him he was wrong. In the opinion of witness, Captain Holton was a man of sound mind.

On cross-examination, witness said that it was at his suggestion that the reason for making the small bequest for Alice and Birch had been left out of the will. It was not left out because Captain Holton agreed that it was not true. He maintained that it was true. Captain Holton had showed witness the letter of December 6, 1901, from Alice and Birch to him, and he was considerably wrought up over it, as he said it indicated to his mind that his children had a fixed determination to insist upon the last penny, and, as he thought, to dictate to him how he should distribute his estate. Witness distinctly remembered seeing this letter, but could not recall when it was Captain Holton showed it to him.

On re-direct examination, witness said that Captain Holton had urged with great persistency his right to the increase in the Shovel Company stock that had come to it from the Ames Company. Had not asked

witness's advice as a lawyer, or his opinion as a lawyer, as to whether he had a right to that increase. The question as to his legal right to it did not arise at all. He placed it on the ground that he was the father of these children, and had raised them, and had done well by them, and that they ought not to act toward him as strangers would, and that it was not a question of mere right and wrong, but he had acted liberally towards them, and they ought to feel disposed to act the same towards him, and, if he wanted a certain thing a certain way, it was but right and just that they should let him have it that way. The question of the legal right never arose, and was not discussed, because he ultimately conceded that, when he made the settlement, as witness understood it. He did not put it on the strictly legal right. He insisted upon his right to retain $100,000 of the Ames stock, because he wanted that much, and because he thought his children ought to allow it to him under the circumstances. Witness said that he thought Captain Holton had a basis for that, as he had already stated; that was the basis stated in the memorandum and stated also in the contracts between him and Alice and Birchard, and on the other statement which witness had made to the effect that Captain Holton considered he had been largely instrumental in creating the value of this property, and making the value of this stock for his children. He discussed that view of it in connection with the memorandum for the will, which he gave to witness.

*Mrs. Lillian M. Holton* testified on her own behalf. This testimony is in the record and appellant submits it to the court. It appears in that testimony, that, when witness was recalled to the stand on the second day of her examination, she stated that when she had given her name when first put on the witness stand as

208 Sup—26

Lillian M. Holton, she had made a mis-statement; that she had been married to Mr. Robert T. Cochran in November, 1903, and was now his wife, and that she had not informed anyone of this, and particularly had not informed her attorney of it, until that morning, about a half hour before.    She said that she had concealed the fact of her marriage through timidity.

*Dr. Edward Francis Brady,* a physician, fifty-one years old, with twenty-seven years practice, testified on a hypothetical case submitted to him by attorneys for appellant that the subject of it was of sound and disposing mind.

This was practically all the testimony in the case.

The suggestion was made of the change of name of Mrs. Lillian M. Holton to Lillian M. Cochran, and it was changed of record accordingly, but all through the trial and in the bill of exceptions and abstract, Mrs. Cochran is referred to as Mrs. Holton.

At the conclusion of all the testimony, the appellant asked the court to instruct the jury that there was no substantial evidence of the incompetency or unsoundness of mind of Edward K. Holton, or of any undue influence having been exerted over him at the time he executed the instrument read in evidence, and that the jury will find that the instrument was the last will and testament of said Edward K. Holton. The court refused the instruction, and appellant, Lillian M. Cochran, duly excepted.

At the instance of plaintiff, respondent here, the court gave instructions marked 1, 2, 2a, 3, 7, 8 and 9; to the giving of each of which appellant duly excepted; and on its own motion gave an instruction as to the number of jurors necessary to concur in the verdict, which are as follows:

"1.    The issue submitted to you in this proceeding is this:

"Is the paper writing here produced and offered

in evidence before you the will of Edward K. Holton, deceased?

"If, under the instructions given, you find from the evidence that said paper writing here produced, is the will of Edward K. Holton, deceased, you will return your verdict in this form:

" 'We, the jury, find that the paper writing produced and read in evidence is the will of Edward K. Holton, deceased.'

"If, under the instructions given, you find from the evidence that said paper writing here produced is not the will of the said Edward K. Holton, deceased, then you will return your verdict in this form:

" 'We, the jury, find that the paper writing produced and read in evidence is not the will of Edward K. Holton, deceased.'

"2.   In determining the issue of sufficient soundness of mind or testamentary capacity possessed by the testator to make a will, before you can find in favor of the proposed will, you must believe from the preponderance of the evidence that at the time of the signing and execution thereof said testator had sufficient understanding to comprehend the nature of the transaction he was engaged in, the nature and extent of his property, and to whom he desired to, and was giving it, without the aid of any other persons, and unless the defendants have shown by such preponderance of evidence that Edward K. Holton did possess all these requisites, you should find the issue in the negative and against the will.

"2a.  In determining the issue of sufficient soundness of mind or testamentary capacity possessed by the testator to make a valid will the will itself and all its provisions may be considered by the jury in connection with all the other facts and circumstances given in evidence.

"3.   Although the jury may find from the evidence

that Edward K. Holton at the time of executing the paper offered as his will, possessed many of the mental requisites, in these instructions set out, as necessary to qualify him to make a valid will, yet if the jury further find from the evidence that from the time of turning over to his son, Birch, and his daughter, Alice, the stocks of the Ames Company belonging to them, down to and including the time of the execution of the paper here offered as a will, the said Edward K. Holton labored under the insane delusion, as hereinafter defined, that said son and daughter had exacted of him and that he had turned over to them a greater amount of said stocks than they were lawfully entitled to demand and receive from him, as their trustee, and that such delusion overcame and controlled his will and judgment, in the execution of the paper offered as his will, and that without the operation of such delusion upon and controlling his mind and judgment, he would have made other provisions in his will for his said son and daughter, or either of them, then you should find that the paper offered is not the will of Edward K. Holton.

"An insane delusion is a fixed and settled belief in something that, in fact, had no existence, which no rational mind would believe.

"7. You are the exclusive judges of the evidence and of the credibility of the witnesses; you will take the law as given you in the instructions of the court.

"In weighing and reconciling the testimony, you should look to the manner and demeanor of the witness in testifying; to his or her readiness and willingness, or tardiness and unwillingness, in answering upon the one side or the other, if such be the fact; to the interest or want of interest of any witness in the case; to whether the witness has any bias or feeling, or not; to his or her relationship to any of the parties in interest; to the witness's means of knowledge of the

fact he testifies to and professes to know and understand; to his or her chance or opportunity for knowing the facts; to the reasonableness or unreasonableness of the story told; to its probability or improbability; to whether the witness has made contradictory statements, or not, about material matters involved in the case; and having thus carefully considered all the matters, the jury must fix the weight and value of the testimony of each and every witness and of the evidence as a whole.

"8. Under the law, the opinions of expert witnesses are admissible in evidence, and are to be given such weight and value as the jury may think right and proper under the circumstances. The value of an expert opinion depends not only upon the qualifications and experience of the witness, but upon the facts which he takes into consideration, and upon which he bases his opinion. If the facts assumed, and which are made the basis of the opinion, are not established by the proof, then the opinion would have no basis upon which to rest, and would be of no value; and in weighing such opinions the jury must look to see whether the facts assumed are established by the proof or not; and you cannot take the facts assumed by the witness to be true simply because they are so assumed, but you will look to the proof to determine whether they are proved or not.

"9. By the expression used in the instructions in this case, 'preponderance or greater weight of the evidence,' is not meant the mere number of witnesses who have testified for or against a given question of fact in issue before you. Such expression means that after you have fully and carefully considered all the evidence in the case, you should decide any one of the questions of fact in favor of the party with whom you find the proof of such fact to have the most convincing effect upon your minds, after you have fully consid-

ered all the facts and circumstances in evidence bearing upon such question.''

The defendant, Lillian M. Holton, otherwise Cochran, asked the court to give instructions number first, third, four and sixth, which are as follows:

"FIRST. The issue in this case is whether or not the document produced and read in evidence of date November 10, 1902, is the will and testament of Edward K. Holton, deceased.

"Under the law of this State every male person being twenty-one years of age and upwards may dispose of all his estate by will—saving to the widow her dower—in such manner as he sees fit and proper, provided he is, at the time he makes the will, of sound mind, and provided the will is in writing, or typewritten, which is the same thing, and is signed by him and is attested by two or more competent witnesses subscribing their names thereto in his presence.

"If, therefore, the jury believe from the evidence in the case that the writing produced and read in evidence was formally executed by Edward K. Holton, according to the above requirements of the law, and that two or more of the subscribing witnesses thereto have testified to the sanity of Edward K. Holton, and that he was of proper age to make a will then the court instructs you that a prima-facie case in favor of the will is made out and it then rests upon the contestants, that is, the plaintiffs in the case, to overcome this prima-facie case by substantial evidence. By prima-facie case, as here used, is meant such a case, as, in the absence of evidence to the contrary, is held to be true.

"THIRD. The court further instructs you that there is no legal evidence in this case tending to prove that Lillian M. Cochran possessed any undue influence over the mind of Edward K. Holton as the term 'undue influence' is used in the law, or that she exerted

or exercised any undue influence upon him at the time
when he is alleged to have executed the paper pro-
duced as his will, and in ariving at your verdict you
will confine yourselves to the evidence bearing upon
the question whether or not Edward K. Holton, at the
time when he is alleged to have executed said paper
as his will, was of sound mind, as sound mind has
been defined in the other instructions.

"FOURTH. The court further instructs you that it
requires no greater mental capacity to make a valid
will than to transact any ordinary business, and that
the owner of the property, who is of sound mind, as
sound mind has been explained to you, has a lawful
right to dispose of his property by will as he sees
fit and proper, save as to such rights of dower as are
in the wife.    The natural objects of one's bounty, in
law, are a man's wife, his children, and those united
to him by blood or marriage; but, if, being of sound
mind, as heretofore defined, and recollecting his chil-
dren or kin, he chooses to disinherit them or give them
or any of them a less share in his estate than they
would have under the law if he had died without mak-
ing a will, or to deprive those nearest to him in blood
of all benefit of his estate, he has a right to do so and
to determine what provision he desires to make for
them, and such disposition of his property is valid,
whether the jury consider it reasonable or unreason-
able, just or unjust.

"If, therefore, the jury believe from the evidence
in the case that Edward K. Holton, recollecting and
knowing who his children and the natural objects of
his bounty were, chose to entirely disinherit any of
them, or to leave them or any of them a comparatively
small portion of his estate or less than he left to others
or less than under the law they would have been en-
titled to if he had died without making a will, he had a

right to do so, provided he was at the time of sound mind, as sound mind has been explained.

"Sixth. The court further instructs you that the fact that Edward K. Holton may have committed suicide shortly after making his will in itself creates no presumption that he was insane when he committed suicide or that he was insane when he is alleged to have executed the paper produced as his will."

The court gave each of said instructions except the sixth, which it refused to give, to which action in refusing to give said sixth instruction said defendant, by counsel, then and there duly excepted.

The said defendant also asked the court to give instructions marked defendant's second and fifth instructions, each of which the court refused to give, but modified each of them by adding thereto the following words, in italics, "without the aid of any other person," and gave them in that modified form; to all of which the appellant duly objected and timely saved her exceptions.

Said instructions as modified and given are as follows:

"Second. The court further instructs you that this prima-facie case being assailed and the validity of the document as the will of Edward K. Holton being attacked, on the ground of the alleged unsoundness of mind of Edward K. Holton at the time when he is alleged to have executed said paper, it is for the defendants—or proponents of the will, as they are called —to prove that Edward K. Holton was of sound mind at the time when he is alleged to have executed the paper produced, of date November 10, 1902.

"In determining the question of whether or not Edward K. Holton possessed testamentary capacity, as it is called, that is, whether or not he was of sound mind, as that term is used in reference to the capacity to make a will, on November 10, 1902, the date when

he is alleged to have made and declared the paper produced as his will, the court instructs you that, if you find from a preponderance of the evidence in the case that said Edward K. Holton at the time it is claimed he executed the paper in writing produced as his last will, had sufficient understanding and intelligence to comprehend the nature of the transaction in which he was then engaged, the nature and extent of his property, and all persons who reasonably came within range of his bounty, and those to whom he desired to and was giving it, *without the aid of any other person,* then the court instructs you that he was possessed of sufficient mental capacity or soundness of mind to make a will.

"FIFTH. The court further instructs you that, even if you believe from the evidence in the case that Edward K. Holton drank to excess, or was suffering from disease, and either of these to such an extent as to weaken or impair his mental faculties, yet, if you find that at the time when it is alleged he executed the paper produced as his will, he was sufficiently sober, and sufficiently in possession and control of his mental faculties to know and understand and comprehend the fact that he was then signing and publishing and declaring said paper as his will, and so as to understand and comprehend the nature and extent of his property, and who were reasonably within the range of his bounty, and to whom he was giving and how he was disposing of his property, *without the aid of any other person,* then the court instructs you that you should find he had sufficient mental capacity to make a will, and, if you so find, your verdict will be in favor of the defendants and you will find that the paper produced of date November 10, 1902, is the last will of Edward K. Holton."

Afterwards, on April 1, 1904, during the February term of said court, the jury, under the evidence and instructions given, found the issues for the plaintiffs,

respondents here, and against the validity of the will, and judgment was rendered accordingly.

In due time defendant, appellant here, filed her motion for a new trial, which was, by the court, overruled, to which action and ruling of the court she duly excepted, and, in due time, appealed from said judgment, and has brought the case to this court for review.

## OPINION.

I. The evidence of the subscribing witnesses tended to show the testator was of lawful age and of sound mind, as well as the due execution of the will. This made a prima-facie case for the proponent. [Harris v. Hays, 53 Mo. l. c. 96.] The burden then of establishing incompetency of the testator to make the will, or that its execution was the result of undue influence exercised over his mind by others, was shifted to and rested upon the contestants. [Harris v. Hays, supra.]

This brings us to the first proposition contended for by the appellant, namely, that there is no substantial evidence in this record to support the verdict, and, for that reason, the trial court erred in refusing appellant's instruction in the nature of a demurrer to the evidence, asked at the close of respondents' case in chief.

The legal test of the requisite mental capacity to make a valid will is measured by the following well-established rule: "The rule in this State is, that one who is capable of comprehending all his property and all persons who reasonably come within the range of his bounty, and who has sufficient intelligence to understand his ordinary business, and to know what disposition he is making of his property, has sufficient capacity to make a will." [Riggin v. Westminster College, 160 Mo. l. c. 579.] Measured by this rule, let us look

at the evidence preserved in this record and see if the testator comes up to these requirements. In testing his mental capacity according to this rule, we must not allow ourselves to become confused as to the time his mind is being inquired into. That he fully came up to those requirements prior to the death of his first wife cannot be denied; but what the condition of his mind was on November 10, 1902, the day on which the will was executed, is a different question altogether, and one not altogether free from doubt. Conceding that he was capable of comprehending all his property and all the persons who reasonably came within the range of his bounty, can it be said and declared as a matter of law, under the light of the evidence in this case, that he possessed sufficient intelligence to understand his ordinary business and to know what disposition he was making of his property at the time he signed this will? We think not.

The evidence shows that prior to the death of his wife the testator was a man of more than ordinary intelligence and business ability, and that he was not only capable of transacting his ordinary business affairs but that he was also very successful in all his business enterprises.

The contestants introduced a large number of witnesses, about twenty-five in number. They consisted of his family physician; three medical experts; the three children of the testator, and several other blood relations; all his business associates, with probably one exception; a number of gentlemen with whom he had business transactions, extending over a period of many years; and several of his neighbors and personal friends and old acquaintances. All the physicians who testified in the case stated that the continued and excessive use of alcoholic liquors would affect the mind, and, if continued for a sufficient length of time, would eventually destroy it entirely. That,

however, is common knowledge, and is known by every one of ordinary intelligence and common observation.

Dr. Graves, the testator's family physician, who appears from his evidence to be an unusually bright and well-posted physician, testified that he had attended Captain Holton, professionally, for nine or ten years just prior to his death, and treated him on an average of three or four times a month during that time, excepting the last eighteen months of his life, and that during those months he treated him seven or eight times a month while the testator was in the city. In substance he testified that Captain Holton prior to the death of his wife was a moderate drinker, but subsequent to that event he used alcoholic liquors to an excess, and that the quantities consumed by him increased as time passed, down to the time of his death; that this excessive use of alcoholic liquors had materially affected his mind and that for two years prior to his death he was suffering from neurasthenia, catarrh of the stomach and *senile dementia,* brought on by excessive drink; that *senile dementia* was a general and progressive breaking down of the intellectual faculties, and that the testator was of unsound mind at the time he executed the will in question, and that he had been so for more than two years prior thereto. He also testified that he attended Captain Holton in his last hours, and that he died of gun-shot wound, self-inflicted.

Drs. Bliss, Fry and Herman were witnesses in behalf of contestants, and testified as experts in the case. A hypothetical question of great length, detailing in substance all the material facts which the evidence tended to prove, was propounded to each of them, and, in answer thereto, they state that in their judgment the testator was suffering from *pre-senile dementia,* and was of unsound mind at the time he signed the will.

All of the members of his family and blood rela-

tions, including his business associates, testified that a gradual and complete physical and mental change took place in him during the last two years of his life. From a strong, vigorous specimen of manhood that he was he became weak and emaciated, having lost from forty to fifty pounds in weight; had a drawn, pinched face and wild staring eyes; that from a bright sunny disposition, in love with life and full of hope, we find him tired of life, filled with despondency, inconsolable and melancholy; the loving husband buried his affections with his first wife and there was no apparent effort made to resurrect them before the altar at the second marriage; the affections of a kind and proud father were metamorphosed into hatred, spite and ill-will, and the only heritage he left to his off-spring was banishment from his presence forever with a curse; the dutiful son lost all respect and love for his old and helpless parents, and with an oath told them they had lived too long, and that he wished his "mother was dead and in hell;" at the funerals of his father and mother he acted more like a demon than an affectionate and dutiful son; he said, substantially, he did not want any damned singing during the services, nor prayers at the grave; that he wanted the services cut damned short, and if they were not cut short he would interrupt them; he lost all respect for religion; cursed and said there was no God or Heaven. His high sense of honor and justice changed to dishonor and injustice toward his children, coveting with an insane or abnormal desire to take from them the heritage their grandfather left in his hands, as trustee, for their use and benefit; this man of fine sense and sound judgment has given up to excessive drink, debauchery, and to the abuse of his fellow-man; this once companionable man is all at once left almost without a friend, as he repeatedly stated, in substance, "No one cares for me, not even my wife or children," and my business asso-

ciates have mistreated me and kicked me out of business; his splendid business ability had surrendered to the ravages of time and to the withering effects of the excessive use of alcoholic liquors; for more than one year before he went out of business he was unable to concentrate his mind on any business matter for any length of time whatever, without a physical break down, and would repeatedly state he "was exhausted and tired;" he got to the point that whenever any business proposition would come up for discussion, if it did not conform to his views, he would fly almost into a spasm and could hardly control himself; during the greater part of 1900 and 1901, he greatly neglected his business, frequently he would not go to the office before eleven o'clock in the morning, and often he would not return in the afternoon; he grew worse in that regard until the year 1901; he very seldom visited the office, or attended to his ordinary duties, which was a matter of great annoyance to his business associates, and they repeatedly complained to him about his neglect of duty.    He persistently stated that he was tired out and wanted to get out of business so he could get a respite from the labors of this life; that was the burden of his remarks for months in the former part of 1901.    His main object in wanting to consolidate with the Ames Company was to enable him to get out of business.    His talk was incoherent and he would curse and abuse Birge because he thought Birge would not let him get out of business.    He wanted to get stock in the new company.    He said, "I can sell that and then I can rest."    He cared but little about the terms of consolidation, he wanted to accept the first terms offered and became very angry at Mr. Birge for not accepting the first proposition made, and cursed and shook his fist in his face because of that refusal.    He could not concentrate his mind upon any business topic without be-

coming exhausted and tired out. After the consolidation with the Ames Company Birge was chosen manager of the St. Louis branch. This greatly offended Captain Holton, and he said he wanted that place, and that he, Birge, had kicked him out of business.

He could not understand the simple duties of his trusteeship of his children's estate; he could not see by what right they could make him account to them for $40,000 stock in the Ames Company, which was four-fifths of their stock in that company, given to them for their $10,000 stock in the St. Louis Shovel Company.

During the last year or so of his life his wife did most of his correspondence, and signed his name to some of the letters; she looked after his bank account and drew his checks; and she looked after and attended to the exchange of his stock in the St. Louis Shovel Company for that in the Ames Company, and the evidence shows she was none the worse for having done so. This record discloses that what little business he had to transact during the last two years of his life, she attended to the most of it for him.

The first will executed by him was drawn from a memorandum in her hand-writing, and the will in question was dictated from that one with but few changes, which were principally in her favor.

He repeatedly stated that he intended to will one-third of his property to his wife and the other two-thirds to his children, and subsequently stated to various parties that he had provided well for his children and his insane brother, while, in fact, he had given the former nothing by his will, and had given the brother the munificent sum of $500, to be paid to him by his wife as his needs might demand.

The record shows she had him to transfer to her all his life insurance, the amount of which does not clearly appear, but somewhere between $5,000 and

$15,000. He, also, at her solicitation transferred to her about $20,000 worth of the Ames Company stock and about $4,500 in cash, and about twenty days before he committed suicide he cut down the bequest to his daughter Lulu from $10,000 to $5,000, and then willed the entire remainder of his estate to his wife, which was worth something over $100,000.

There are a few facts in this record which stand out in bold relief, and among them are the following:

Every witness, without an exception, introduced by respondents, most of whom were either blood relations or business associates, testified that in their opinions the testator was of unsound mind at the time he executed the will and had been for about two years prior thereto; the sincere love and devotion Captain Holton entertained for his first wife and all of his children; in fact, the loss of his wife was really the primary cause of his excessive drinking and downfall, and at the same time increased and intensified his love and affection for his children; the unjust and illegal claim he made to the major portion of his children's stock in the Ames Tool & Shovel Company, and their disinheritance by him because they would not yield to his unlawful and unjust demands; and this record does not show Captain Holton entertained any special love for his second wife, or that she entertained much for him.

Upon this state of the record, the question naturally presents itself, Why did he disinherit his children, whom he loved better than all others on earth, and give that which naturally belonged to them to another, who was a wife but in name, and for whom he entertained but little respect and less affection? Why did he have his children assign to her the insurance policies on his life and payable to them? Why did he reduce the bequest of $10,000 made to his daughter Lulu in the first will to $5,000 in the second or last will?

And why did he want to illegally and unjustly take from his son, Birch, and daughter, Alice, $40,000 worth of stock in the Ames Company? In answer to the last question, under the light of the evidence in this case, it would not take a very strong prophetic eye to see that his object and purpose were to take from them that which legally and morally belonged to them, and to illegally and immorally give it to their step-mother, the person and agent who so ably and successfully conducted and managed his business as to have at his death, not only a "joint bank account" with him, but the exclusive ownership of his entire fortune. Viewed in the light of all the facts and circumstances surrounding the testator and the beneficiaries under the will, we can but denounce it as one of the most unnatural and unjust wills to which our attention has been called. And in our judgment there is but one explanation for his conduct, and that is he was of unsound mind and did not understand his ordinary business, nor what disposition he was making of his property. [Crossan v. Crossan, 169 Mo. l. c. 639; Archambault v. Blanchard, 198 Mo. 384; Sayre v. Trustees, 192 Mo. 95.]

We are, therefore, of the opinion that the contention of appellant, that there is no evidence in the case to support the verdict, is not well founded, as the facts and evidence disclosed by this record abundantly show.

We have carefully read every word and line of the voluminous abstracts of record in this case, and find much strong and creditable testimony introduced on the part of appellant tending to prove the sanity of the testator, and to show that he was mentally capable of making a valid will; yet, most of her witnesses did not bear the same close family, social and business relations to the testator that the respondents' witnesses bore to him, and for that reason they did not possess the same favorable position and opportunities of see-

ing and knowing him as they did. This gives to their evidence great weight. As said by this court, ''Testimony of the mental capacity of the testator should come, as far as possible, from those persons who have had extensive opportunity to observe his conduct, habits and mental peculiarities, extending over a considerable period of time, and reaching back to a period anterior to the malady.'' [Knapp v. Trust Co., 199 Mo. l. c. 660.]

The marked changes in his social and business habits, mind and love and devotion for his children are strong evidences of unsoundness of mind. As well said by GANTT, J., ''Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the person.'' [Knapp v. Trust Co., 199 Mo. l. c. 665.]

We are, therefore, not only unable to say the verdict is against the weight of the evidence, but in our judgment there is not only substantial evidence in this record to sustain the verdict, but if it was within the province of the court to weigh the evidence, and if we were called upon to do so, we would unhesitatingly say the preponderance of the evidence was on the side of the respondents.

We are, therefore, of the opinion the trial court correctly refused appellant's demurrer to the evidence.

II.   The second assignment of error made by the appellant is the action of the court in giving respondents' third instruction. That instruction, in effect, told the jury that even though they might find the testator possessed many of the mental requisites which were necessary to qualify him to make a valid will, yet if they further find that he was laboring under an insane delusion that his son Birch and his daughter Alice had exacted of him and that he had turned over to them a greater amount of stock in the Ames Company than

they were lawfully entitled to, and that such delusion overcame and controlled his will and judgment in the execution of the will, then they would find the instrument was not the will of testator.

Counsel for appellant seem to misconstrue the meaning of this instruction. Their contention is, that this instruction confused the minds of the jury and was contradictory in itself; for, if he had the mental requisites to make a will, he could not have had an insane delusion; and, if he had an insane delusion, he had not the mental requisites to make a valid will. Counsel seem to be laboring under the erroneous impression that this instruction told the jury that even though they found from the evidence that the testator possessed *all* of the mental requisites necessary to qualify him to make a valid will, yet if he was laboring under the delusion then they would find that it was not his will.

But by reading the instruction, it will be seen that it does not make use of the word "all" in connection with the mental requisites one must possess in order to make a valid will, but it uses the word "many" in that connection, which makes the instruction read and mean, that even though he may have possessed *many* of the mental requisites, yet if he still had an insane delusion, and that delusion controlled him, then it was not his will. This, we understand to be a correct statement of the law, because he must possess all of the requirements of the rule, namely, must be "capable of comprehending all his property and all persons who reasonably come within the range of his bounty, and who has sufficient intelligence to understand his ordinary business, and to know what disposition he is making of his property." [Riggin v. Westminster College, 160 Mo. l. c. 579.] This rule makes four requisites, and one must possess *all* of them before he is capable of making a valid will; and the instruction complained of

in effect told the jury that the possession of a portion
of them was not sufficient, but that he must have pos-
sessed all of them.  Clearly, there was no error in the
instruction, nor in the action of the court in giving it.
It is in harmony with a long, unbroken line of adjudi-
cations in this State.  [Benoist v. Murrin, 58 Mo. 322;
Jackson v. Hardin, 83 Mo. 175; Brinkman v. Ruegge-
sick, 71 Mo. 553; Hughes v. Rader, 183 Mo. l. c. 703.]

A second objection lodged against this instruction
is, that it practically told the jury that there was no
basis for Captain Holton to claim anything over the
$5,000 referred to.  We have very carefully read all
the evidence in the record bearing upon this claim of
the testator, and have failed to find any evidence what-
ever tending in the remotest degree to support any le-
gal or moral right he had to any portion of the bequest
made to his son and daughter, or to any of its increase.
The only pretense set up by him to said fund is, that
he was an officer and stockholder in the St. Louis Shov-
el Company, and that through his efforts the value of
the children's stock therein had greatly increased, and
for that reason he was entitled to all, or, at least, a
portion of that increase.  But the evidence conclusively
shows that he was the father and trustee of said chil-
dren, and that he was paid a fair consideration for
whatever services he rendered the company, and that
he received not only the dividends declared upon his
own stock in the company but also all of those on the
children's stock, over and above eight per cent inter-
est, which he paid them annually in lieu of the divi-
dends, which greatly exceeded the eight per cent by
nearly $8,000.  Besides this, the evidence shows he was
but one of a number of gentlemen who contributed
their valuable services to this company, and through
whose efforts the stock was made so valuable.  In fact,
he was by no means the controlling spirit in that com-
pany, and had it not been for the dogged tenacity of

Julius Birge, its president, displayed during the negotiations of consolidation, much of the value of the stock would have been sacrificed to the Ames Company, which would have included all of the stock of the company—his own, as well as that of his children.

This pretended claim of the testator was so destitute of merit, and so devoid of all justice and equity, the irresistible conclusion must be reached that no sane man, with the love and affection he unquestionably entertained for his children, would have so persistently asserted it as he did, nor would have disinherited them, and forever banished them from his presence, simply because of their denial of that unreasonable and unjust claim, and especially is this true where the evidence shows they were practically without means, and that he had plenty and was living in affluence.

We are, therefore, not only of the opinion that Captain Holton was of unsound mind at the time he executed the will, as stated in paragraph one of this opinion, but we are also of the opinion that there was substantial evidence tending to prove he was laboring under an insane delusion that his son and daughter had unjustly exacted of him and that he turned over to them a greater amount of the Ames stock than they were lawfully entitled to demand from him as their trustee, and that such delusion controlled his will and judgment in the execution of the instrument offered as his will, and that there was no error in the action of the court in submitting that issue to the jury. If that delusion existed and dominated him in making his will, as the jury found, and in which we concur, then Captain Holton was incapable on that account of making a valid will. [American Bible Society v. Price, 115 Ill. l. c. 632; Knapp v. Trust Co., 199 Mo. 640, l. c. 667; Lancaster v. Lancaster, 87 S. W. 1137; Benoist v. Murrin, 58 Mo. l. c. 319; Thomas v. Carter, 170 Pa. St. 272; Boardman v. Woodman, 47 N. H. 136.]

III.   The next complaint of appellant is found in her objection to instruction number two, given for respondent, and to the action of the court in refusing to give the second and fifth instructions as asked by her, and their modification by the court, and its action in giving them in the modified form.

Instruction number two given for respondent, in effect, told the jury that in determining the testamentary capacity of the testator to make a will, they must believe from the evidence that he had sufficient understanding to comprehend the nature of the transaction he was engaged in, the nature and extent of his property, and to whom he desired to and was going to give it, *without the aid of any other person,* and unless she has shown by the evidence he possessed all of these requisites, then they should find against the will.

The particular objection urged against this instruction is directed against the words, "without the aid of any other person," which are found therein italicized.   Counsel for appellant contends that "if it is meant by the use of those words to include that as a test of the validity of the will, then it is an injection of a qualification not set out in the Statute of Wills." [R. S. 1899, sec. 4602.]

Counsel clearly misconceive the meaning of this instruction.   It is not meant by the use of those words to add an additional qualification to those prescribed by the rule of law, declaring what the mental requisites are which a person must possess in order to be qualified to make a valid will.   They are employed for the sole purpose of indicating to the jury the degree or strength of the mind which was necessary for the testator to possess at the time of the execution of the will, in order to stamp it with validity.   If the testator's mind was not strong enough "without the aid of some other person" to comprehend all his property and all the persons who naturally came within the

range of his bounty, or if he did not have sufficient
intelligence to understand his ordinary business, or to
know what disposition he was making of his property,
without the assistance of some one else, then he was not
a man "of sound mind" within the meaning of those
words, as used in the Statute of Wills.

A man would have to be almost an idiot or a raving
maniac if he could not, with the assistance of others,
recall to mind his property and the natural objects of
his bounty, or be made to understand he was making
a will and to realize to whom he was giving his prop-
erty. But if let alone and unassisted, he could be wholly
incapable to call all of those things to mind, and com-
prehend the nature of the transaction, and the dispo-
sition he was making of his property. The instruction
in question was bottomed upon the doctrine announced
in the case of Crossan v. Crossan, 169 Mo. 1. c. 641, in
which the court, speaking through GANTT, J., said, "At
the time of signing and executing the will, the testatrix.
had sufficient understanding to comprehend the nature
of the transaction she was engaged in, the nature and
extent of her property, and to whom she desired to,
and was giving it, *without the aid of any other person.*"
That case and the authorities upon which it is based
are decisive of the question here presented.

Appellant's instructions two and five asked were,
in effect, the same as respondent's number two, just
discussed, with the words "without the aid of any other
person" omitted therefrom. The court refused the in-
structions as asked, and then modified them by insert-
ing the words, "without the aid of any other person,"
and gave them in that modified form, to which action
of the court the appellant excepted. According to the
law as declared, in passing upon instruction number
two as given for respondent, we must hold that there
was no error in the action of the court in refusing said

instructions as asked, nor in modifying and giving them in the modified form.

IV. It is next insisted by appellant that the trial court erred in permitting. the hypothetical question propounded by respondents on the subject of the testator's insanity or the unsoundness of his mind, to be asked or answered. It is contended that the question "failed to present the principal and controlling facts; many of the facts presented are incorrectly grouped and incorrectly stated; and that they were stated in a misleading manner."

The question is very lengthy and would probably cover ten or twelve pages of one of our reports, if set out in full, which we believe is unnecessary. We have, however, carefully examined the facts assumed in the hypothetical case, and are of the opinion that it embodies substantially all of the material facts relating to the subject under consideration. Counsel for appellant have not pointed out to us in what particular the facts are improperly grouped, or in what manner they are misleading to the jury. We have re-examined the question with those suggestions in mind and have failed to discover the error complained of in that regard. If, however, the question is subject to the criticisms made by appellant, it is her fault in not calling our attention to the specific objectionable features. [Longan v. Weltmer, 180 Mo. l. c. 340.] If the hypothetical question substantially embraces the facts disclosed by the evidence, that is sufficient and all the law requires. [State v. Baber, 74 Mo. l. c. 297; Clevenger's Medical Jurisprudence, 544.] And "counsel in propounding a hypothetical question to an expert witness may assume any state of facts which the evidence tends to establish and may vary the questions so as to cover and present the different theories of facts." [Hicks v. Railroad, 124 Mo. l. c. 125.]

V.  Complaint is made to the action of the court in refusing appellant's sixth instruction asked.  It told the jury, in effect, that the mere fact that Edward K. Holton may have committed suicide shortly after the execution of the will in question created no presumption that he was insane when he executed the will, or when he committed suicide.

While it may be true that the mere fact he committed suicide would not raise a presumption that he was insane at the time he signed the will, or at the time he took his own life, yet the evidence abundantly shows that there was a strong predisposition to insanity in the testator's family, which fact and the act of suicide, the physicians testified would have a good deal of weight in determining the condition of his mind at the times in question.  Under this state of the evidence the instruction would have been misleading to the jury, and would have virtually eliminated from their consideration the fact of suicide, which fact they had the right to consider and weigh with all the other facts and circumstances in the case.  If the fact of suicide was admissible at all in the evidence, then the jury, should have been left at liberty to weigh that fact just as they would any other fact in the case, without any special attention being called thereto, on the one side or the other.  The jury was not told that suicide would raise such a presumption, and, clearly, there was no error in the court's action in refusing to give to the jury the instruction mentioned.

VI.  It is finally contended by appellant that the admission of the evidence of the action of Captain Holton at the time of the death of his wife and father-in-law, which occurred in 1891, had no tendency to establish the condition of the testator's mind at the date of making the will in 1902.

In this contention we cannot lend our concurrence. Judge SHERWOOD tersely and clearly stated the law

upon that question in the following language: "When a charge of insanity or imbecility is made against a testator, evidence is competent to show the condition of his mind long prior to and closely approaching the time of the will's execution, as well as the condition of his mind shortly subsequent to such execution." [Von De Veld v. Judy, 143 Mo. 1. c. 363.] And in the case of Knapp v. Trust Co., 199 Mo. 640, this court said, in a case of this character, that the inquiry should extend over a considerable period of time and reach back to a period anterior to the malady.

VII. There are several other minor reasons assigned for a reversal of the judgment, based principally upon the rulings of the court regarding the admission and rejection of testimony.

We have carefully examined all of them, and find no substantial merit in any of them, and it would be a useless prolongation of this opinion, which is too long now, to further review them.

In our opinion the cause was well tried, and the conclusions reached are in harmony with the right and justice of the case.

The judgment of the circuit court was for the right parties, and it is, therefore, affirmed.

All concur.